**Frank DANIELS, Plaintiff–Appellee, Cross–Appellant,**

v.

**PIPEFITTERS' ASSOCIATION LOCAL UNION NO. 597, Defendant– Appellant, Cross–Appellee.**

**Nos. 90–3124, 90–3261.**

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1991.

Decided Sept. 30, 1991.

Rehearing Denied Oct. 30, 1991.

John L. Stainthorp (argued), Peter Schmiedel, Peoples Law Office, Robin B. Potter, Mark S. Stein, Potter & Schaffner, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Steven B. Varick (argued), McBride, Baker & Coles, A. Denison Weaver, Hugh J. McCarthy, Robert P. Lyons, Nancy J. Doyle, David M. Lefkow, Hugh J. McCarthy, Jr., McCarthy & Associates, Marvin Gittler, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, Ill., Sally M. Armstrong, O'Donoghue & O'Donoghue, Washington, D.C., for defendant-appellant, cross-appellee.

Before CUMMINGS and POSNER, Circuit Judges, and NOLAND, Senior District Judge.*

CUMMINGS, Circuit Judge.

The backdrop to this case of individual racial discrimination is the historic resistance within the building trades in the Chicago area to accepting racial and ethnic minorities into their ranks. The plaintiff, Frank Daniels, is black. He was able to get his start as a pipefitter and welder on account of the Chicago Plan, a government-sponsored directive designed to increase minority representation in the construction industry.[1] Daniels left the building trade fourteen years later when he was expelled from his trade union, Pipefitters' Association Local Union Number 597. His abrupt departure was also predicated on race, but this time the union used his race against him rather than in his favor.

After he was expelled from Local 597, Daniels filed suit against the union. He charged the union with race discrimination and retaliation causing him to be denied job referrals and to be expelled from Local 597. Daniels alleged multiple legal theories and claimed relief under Section 1981 of the 1866 Civil Rights Act (42 U.S.C. § 1981), Section 301 of the Labor Management Relations Act (29 U.S.C. § 185), and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2). His § 1981 and § 301 claims were tried before a jury, which returned a general verdict in Daniels' favor and awarded him compensatory damages of $181,063.50 and punitive damages of $150,000.00. The district court held a bench trial on plaintiff's Title VII claim and entered judgment in favor of Daniels. Plaintiff then petitioned for attorneys' fees and the district court awarded fees of $265,777.00 and costs in the amount of

---

* The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is sitting by designation.

1. In its General Findings to the Chicago Plan, the United States Department of Labor explained the historic discrimination faced by minorities in the construction industry in the Chicago area. The Chicago Plan recognized that the construction industry's reliance on referrals by the construction craft unions accounted in large part for the underrepresentation of minorities:

> [M]inority workers * * * require action on the part of their government to ensure the enjoyment of equal employment opportunities necessitating action on a broad scale. The underutilization of minorities is due in substantial measure to the unique nature of employment practices in the construction industry where contractors and subcontractors rely on construction craft unions as their prime or sole labor source. Collective bargaining agreements and/or established custom and usage between construction contractors * * * and labor organizations frequently provide for or result in exclusive hiring halls. * * * As a result, referral by the labor organization is a virtual necessity for obtaining meaningful employment in union construction projects. Minorities have in the past and in some instances are still excluded from access to * * * certain construction trades. As a result of the foregoing, minority persons still do not enjoy full equal employment opportunities in the Chicago, Illinois area construction trades.
>
> It is further found that the previous efforts to correct this inequity have not been successful and that it is necessary * * * to adopt a specific program which will provide for equal employment opportunity in the * * * construction industry.

Chicago Plan, Plaintiff's Exhibit 14.

$6,312.10. For the following reasons, we affirm.

## I. FACTS

A recitation of the racist slurs directed at the black members of Local 597 provides an introduction to the work environment that plaintiff protested against. When the federal government initiated the Chicago Plan and directed the union to accept additional blacks, the union's head complained that "big brother government came in and told us that we had to accept blacks and the rest of the minorities" (Tr. 1144). When a black pipefitter decided to run for a union position, the same union head complained that "this has been a white man's union * * *" (Tr. 810–812). Use of racial epithets by union officials pervaded the hiring hall. White members were told that they would not get jobs while they were "with those black people and with those niggers" (Tr. 1145–1146). Another official told a white member that "You're just too friendly with the wrong kind of people * * *. You're always with those niggers, porch monkeys * * *" (Tr. 1146–1147). Blacks were referred to as "baboon[s]," "porch monkeys," "spear-chuckers," "ghetto assholes," "nigger," "super nigger," "melanzanni" (Italian for eggplant), and "tutsune" (Italian for nigger) (Tr. 1149–1150, 1152, 1154–1155).

Daniels entered this work environment in 1970 after graduating from the Greer Technical Institute in Norridge, Illinois, where he was trained and certified as a welder. Upon his entry into the workforce, Local 597 issued him a work permit and admitted him to full membership in the union in January 1973. He remained a member of the union in good standing until he was expelled on February 1, 1984. Daniels' discrimination claims sought damages for the period beginning on October 7, 1980, and ending June 20, 1985.

During his tenure as a member of Local 597, the plaintiff was a persistent critic of his union's racial hiring practices. He filed numerous complaints with the National Labor Relations Board, the Fair Employment Practices Commission, the Equal Employ-ment Opportunity Commission, and the Illinois Department of Human Rights. All of these complaints concerned various incidents of racial discrimination and racial harassment. Dissatisfied with Local 597's discriminatory treatment of him, plaintiff paid his union dues under protest over a period of several years.

The union that Daniels joined, Local 597, is the exclusive bargaining agent for pipefitters and welders. It refers its members through a job referral service to the Mechanical Contractors' Association, an organization of contractors that employs welders and pipefitters. Local 597 operates the referral service out of the union hall ("information hall"). The arrangement whereby Local 597 refers its members to the contractors is governed by a contract—the Area Agreement. The Agreement specifically prohibits Local 597 from discriminating in referrals "because of race, color, national origin, creed, or sex" and requires the union to "advise applicants for work about available positions on a non-discriminatory basis" (Plaintiff's Exhibit 11, Article X, § 5).

Under the Area Agreement, contractors are under no obligation to hire exclusively through the job referral service operated out of the information hall. However, when the contractor hires a non-union employee, that person must become a union member within seven days and must maintain union membership throughout the term of employment.

Daniels challenged three aspects of this hiring apparatus in his lawsuit. He challenged the referral system in place at Local 597 as racially discriminatory, alleging that it deprived him of job referrals; interfered with his ability to obtain work; and failed to represent him adequately in the grievance process. Plaintiff's second claim—for expulsion—rested on his view that the union retaliated against him because he had previously filed charges of racial discrimination against Local 597. Third, plaintiff brought what he called a § 301 claim for breach of the duty of fair representation. Under this rubric, plaintiff identified the discrimination in job referrals, his expul-

sion from the union, and the union's violation of the non-discrimination clauses of the Area Agreement.

### A. The Referral System

Plaintiff challenged the job referral service that Local 597 operated pursuant to the Area Agreement. A contractor in need of welders or pipefitters informed Local 597 that it was hiring. The union official on duty at the information hall, the Business Agent, recorded the inquiry on a request sheet, selected the appropriate number of union members to refer to the job, and then recorded the referral on a dispatch sheet. The Business Agent limited the number of referrals to the number of workers requested. Local 597 covered a large jurisdiction [2] and its job referral system was an important source of jobs. Some contractors, including Phillips and Getschow, the largest contractor in the area, made a practice of hiring only those workers referred from the information hall. In the period from 1972, Local 597 employed, on the average, 1,900 to 2,000 pipefitters and welders at any one time—at times fully one-third of Local 597's membership.

Despite the importance of the referral service to the hiring of pipefitters and welders, Local 597 had no written rules for the operation of the referral system. In theory, jobs through the referral service were given out on a first-come, first-serve basis to the union members on hand at the information hall, and then on a random basis to other members. In practice, the referral service operated much differently.

The Local 597 Business Agents responsible for doling out the work opportunities maintained a blacklist containing the names of those black union members and others who were not to receive referrals. Instead, those favored (and white) union members received their job assignments through the back door. The Business Agents circumvented the information hall by awarding job assignments in the union hall's back

room and over the telephone. One white member of Local 597, Ron Chopp, characterized the referral system as "a union within a union" (Tr. 1129). When Chopp was a "favored" union member, he received job referrals by calling the union hall directly, or by receiving unsolicited offers from the Business Agents who telephoned him (Tr. 1124). After Chopp fell out of favor due to a dispute between him and the union, he described one instance where he was present in the hall and told by the Business Agent on duty that there was no work available. In truth, however, another union member was called into the back room on the very same day, given a referral for himself and two of his companions, and told: "don't say anything to Choppy" (Tr. 1134).

The experiences of Daniels and other black union members were no better. The evidence showed that Local 597 had a long history of discriminatory treatment of blacks. Despite the Chicago Plan, whose avowed goal was to increase black membership in the union, the black membership in Local 597 remained constant or declined. Documents submitted by Local 597 to the EEOC showed that in 1979 there were 7,561 members, 443 of whom were black. Seven years later, the overall figure increased slightly to 7,575, but the number of blacks had dwindled to 308 (Tr. 112–113).

Plaintiff also introduced the expert testimony of Professor Thomas DiPrete, an assistant professor in the Department of Sociology at the University of Chicago and a specialist in quantitative methodology and labor force dynamics. He compared the percentages of blacks and whites who were referred and concluded that black members of Local 597 received fewer job referrals than they should relative to their population in the referral hall. He pegged the statistical probability of this disparity occurring by chance at one in a trillion for 1981 and one in ten thousand for the years 1983 and 1984.

---

**2.** Local 597's jurisdiction covered Cook, Lake, Will, McHenry, and portions of Grundy, DuPage and Kane Counties in Illinois, and Lake, La-Porte, Porter, Newton and Jasper Counties in Indiana.

One of plaintiff's fellow union members, James Ferguson, testified that he complained to a union official about the racism present in the union as early as 1980. Specifically, Ferguson described one instance where, after being told by a Business Agent that mega-contractor Phillips and Getschow had no need to hire members of Local 597, he and six fellow members traveled directly to the construction site where they were hired on the spot.

Plaintiff testified that he was present at the information hall on several occasions when the discrimination in referrals essentially took place in plain view. While he stood around waiting for an assignment, he heard Business Agents giving out referrals over the telephone and observed favored union members going into the back room to receive referrals. On other occasions, the Business Agents went into the back room and picked names from a hat to determine who would receive a job assignment. Even when the Business Agents seemingly left things to chance, plaintiff stood by and watched others get all the referrals. There were even days when Daniels had to ask Business Agents to sign his unemployment card and state that there was no work available, when in fact the union records reveal that job assignments were in fact given. One Business Agent, referring to Daniels' grievances against the union, said that he would not refer him: "Not that guy, I'm not going to refer him, he is trouble to the union; I would never refer him to a job" (Tr. 614). Other Business Agents told Daniels that they would not give him referrals.

In addition to withholding referrals from Daniels, Local 597 actively obstructed him from obtaining employment at the Zion, Illinois Nuclear Power Plant by refusing to submit a *pro forma* "good guy" letter of recommendation. Because he didn't have the letter, the employer required him to take the Minnesota Multiphasic Personality Inventory ("MMPI") psychological examination. Daniels viewed the test as a humiliation and Local 597's refusal to send the "good guy" letter as yet another attempt by the union to aggravate him.

In addition to being deprived of referral opportunities, plaintiff also was subjected to racial slurs. When he sought full union membership in the early 1970s, Daniels' superintendent told him that "they didn't permit niggers in the union and that if [he] persisted in trying to obtain a card in the union that [his] health would be in danger, as well as [his] family" (Tr. 1301). When he went to pick up his union card, he was told: "You nigger, get out of this fucking hall. We do not allow niggers on the premises. * * * [N]iggers don't hold cards in this union * * *. Nigger, I told you to get out of here" (Tr. 1302–1303).

### B. *Plaintiff's Expulsion from Local 597*

Daniels was expelled from Local 597 on February 1, 1984, as a result of the internal disciplinary hearing held after he and one of the Business Agents, Frank LaBanca, got into a fight. The details of the fight are unclear, but it began because of a dispute over the volume of plaintiff's radio in the union hall. Apparently the fight did not get more physical than pushing and shoving, and neither plaintiff nor LaBanca was injured. After the altercation, LaBanca filed criminal charges against Daniels. Plaintiff, on the other hand, attempted to file union disciplinary charges against LaBanca, but was prevented from doing so by union officials. Union officials permitted LaBanca to file internal disciplinary charges against Daniels, and the case was brought before the union at a membership meeting. Kenneth Lee, a Local 597 Vice-President and chair of the disciplinary committee, presided. When Daniels attempted to present his side of the story, Lee turned off the sound system, declared Daniels to be out of order, and adjourned the meeting. Subsequently, the executive board, which included Lee, considered LaBanca's charges against Daniels and concluded that Daniels was guilty beyond a reasonable doubt of playing his radio too loudly and of striking LaBanca. As a penalty, the executive board expelled plaintiff from Local 597 and fined him $5,000 (Tr. 1413; Plaintiff's Exhibits 10E, 10G). Local 597 referred the finding of guilt to the International Union,

which affirmed Local 597's decision. La-Banca's criminal charges against Daniels did not proceed so successfully. A jury found Daniels not guilty (Tr. 1415–1416), but the union ignored this fact and when the International proceeded to uphold the Local's penalties (without having been informed of Daniels' acquittal in a court of law), Local 597 expelled Daniels.

## II. ANALYSIS

### A. *Plaintiff's Legal Claims*

#### 1. Discrimination in referrals

■ Local 597 challenges its liability to plaintiff under 42 U.S.C. § 1981, claiming that the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132, wrought a change in the law that invalidates the legal support for plaintiff's claim. This Court applies *Patterson* retroactively to cases that had not become final before the Supreme Court decided *Patterson. Mozee v. American Comm'l Marine Serv.* 940 F.2d 1036, 1051 (7th Cir.1991); *Bailey v. Northern Indiana Pub. Serv. Co.*, 910 F.2d 406, 407 (7th Cir.1990); *McKnight v. General Motors Corp.*, 908 F.2d 104, 108–109 (7th Cir.1989), certiorari denied, — U.S. ——, 111 S.Ct. 1306, 113 L.Ed.2d 241. Before *Patterson*, § 1981 had been interpreted to prohibit a whole range of private discriminatory conduct on the basis of race, ethnicity, religion and other protected categories.

Although the language of § 1981 discusses the equal rights of all persons "to make and enforce contracts," the scope of a private actor's liability under § 1981 formerly arose in the context of a wide spectrum of relationships flowing from the creation of the contract. *Patterson* changed all this. The Supreme Court ordered reargument *sua sponte* on the question whether *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415, the decision establishing the applicability of § 1981 to private conduct, should be overturned. 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (per curiam). Having heard oral argument in *Patterson* a second time to consider the continued viability of its twelve-year-old decision in *Runyon*, the Court decided that § 1981 covered private acts of discrimination after all, but dramatically narrowed the statute's scope. Under *Patterson*, recovery under § 1981 is limited to discriminatory "conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Patterson*, 491 U.S. at 179–180, 109 S.Ct. at 2374.

■ With *Patterson* on the books, black plaintiffs (and plaintiffs in other protected groups) can only use § 1981 to vindicate their civil rights when the acts of intentional discrimination prevent them from entering into contracts or from enforcing established contract rights. The enforcement prong of § 1981 liability gives rise to a narrow interpretation. Enforcement of contract rights does not mean enforcement of the right to be free from discrimination after the contractual relationship is entered into. On the contrary, impediments to enforcement arise only when blacks are prevented from enforcing rights that are specifically enumerated in the contract. To illustrate the point, an employer who impedes an employee's access to an internal grievance procedure, when the employee seeks to complain of his employer's failure to live up to its contractual obligation, has interfered with the enforcement of a contract within the meaning of § 1981 post-*Patterson*. Alternatively, *Patterson* characterized racial harassment occurring after the formation of the contract as "reprehensible * * * if true" but not actionable under § 1981. *Id.* at 179, 109 S.Ct. at 2374. *Patterson* established the broad proposition that discriminatory post-formation conduct is not actionable under § 1981 and left it to the lower courts to determine precisely what type of conduct is properly characterized as discrimination in formation and enforcement, and what type of conduct is unactionable (under § 1981) post-formation conduct.[3]

**3.** As we have stated before, in recognizing that *Patterson* left to the lower courts the task of spelling out the scope of § 1981's coverage:

■ Local 597 seizes on *Patterson's* pronounced impact on the law and urges us to reverse the jury's verdict on the ground that § 1981 no longer provides a cause of action for Daniels. On appeal, defendant argues that the job referral service, however discriminatory it may be, is not actionable under § 1981 as discrimination in the making of a contract. First, defendant claims that the job referral service was nothing more than a mechanism to encourage union members to find employment with contractors. As a provider of "job leads," Local 597 asserts that its role cannot be characterized as facilitating the making of a contract. Alternatively, defendant contends that even if it impeded Daniels' efforts to enter into a contract, he was only prevented from entering into a contract *with others*. Obstructing someone's right to contract with others is, in the view of Local 597, unactionable under § 1981.

■ This interpretation of § 1981 shortens the reach of the statute and prevents the Reconstruction-era civil rights remedy from being used to impose liability on intermediaries who erect insurmountable barriers to the formation of contracts. *Patterson* narrowed § 1981 by limiting the applicability of the statute to specific types of conduct; it did not bestow immunity on certain discriminatory actors. As the Supreme Court stated, "[§ 1981] prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Patterson,* 491 U.S. at 176–177, 109 S.Ct. at 2372.

By describing the referral service as a source of encouragement, Local 597 attempts to make the union hall sound more like the want ads section of a newspaper than like an indispensable step in a union member's effort to obtain a position. Local 597's job referral service was the primary mechanism through which contractors hired union employees pursuant to the Area Agreement. In any given year, Local 597 referred approximately one-third of its members to employers. As discussed above, the largest contractor relied exclusively on the referral system. In essence, no referral meant no job and no opportunity for union members to enter into employment contracts with employers. For blacks, the referral system was particularly critical, for the promise of non-discriminatory job referrals as guaranteed by the collective bargaining agreement meant that employers could not choose employees on the basis of race. An unbiased referral system would have assisted black union members in overcoming the racism they might have faced were they required to apply for positions on their own. Moreover, a referral system free of discrimination's taint would open additional doors of opportunity to blacks, who because of their historic exclusion from the industry, lacked the personal contacts to hear about job openings through other means.

Unfortunately for plaintiff, the referral system did not increase the availability of his job opportunities to overcome the entrenched discrimination in the industry, but instead was infected with discrimination so that the referral system erected substantial barriers to plaintiff's ability to enter into contracts with employers. This kind of race-based impediment to contract formation constitutes exactly the sort of racially discriminatory interference with the right to contract that remains actionable under § 1981. To hold otherwise would impose a sort of § 1981 privity of contract requirement that would effectively protect third parties such as labor unions from § 1981 liability.

■ Local 597 argues that even if the referral system was discriminatory, § 1981 does not cover discriminatory interference with the right to contract with others. While it is true that the contract exists between the employer and the employee, and not between the employee and the un-

---

We show no disrespect to the Supreme Court * * *. The glory of the Anglo–American system of adjudication is that general principles are tested in the crucible of concrete controversies. A court cannot be assumed to ad-dress and resolve in the case in which it first lays down a rule every controversy within the semantic reach of the rule.
*Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1312 (7th Cir.1989).

ion, this distinction does not insulate the union from § 1981 liability. Local 597 is not an unrelated third party whose interference with the contract bears an attenuated or haphazard connection to contracting between its members and the employer. On the contrary, Local 597 is the necessary intermediary and conduit connecting job opportunities to job referrals. By discriminating against the plaintiff through a refusal to refer him for jobs, Local 597 intentionally deprived Daniels of the ability to enter into contracts with employers, and this manner of discrimination falls squarely within the prohibition of § 1981. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669, 107 S.Ct. 2617, 2625, 96 L.Ed.2d 572 (holding that "union which intentionally avoids asserting discrimination claims, either so as not to antagonize the employer and thus improve its chances of success on other issues, or in deference to the perceived desires of its white membership, is liable under * * * § 1981"); see, *e.g., General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391–392, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (holding that intentionally discriminatory operation of union hiring hall did not permit imposition of vicarious § 1981 liability on the employer, where the employer, rather than the union, was named as a defendant). Such conduct was prohibited before *Patterson*, and the Supreme Court's decision in that case did nothing to change this.

We have demonstrated that Local 597's operation of its hiring hall discriminated against plaintiff because of his race and prevented him from forging new contracts with employers through referrals. *Patterson* fixes our attention on contracts, and there is one more contract to consider in evaluating Daniels' § 1981 claim of discrimination in referrals. The collective bargaining agreement between Local 597 and Mechanical Contractors' Association is a contract containing an express non-discrimination clause that commits the union to refer its members on a non-discriminatory basis:

nor shall there be any discrimination [with reference to opportunities for employment] * * * because of race, color, national origin, creed, or sex of the applicant. The Union will advise applicants for work about available jobs on a non-discriminatory basis * * *.

(Article X, Section 6 of Collective Bargaining Agreement at Plaintiff's Br. 26). Defendant's intentional discrimination in the operation of its information hall violates the letter of this non-discrimination clause. Whether Local 597's acts give rise to liability under § 1981 for discrimination in the enforcement of contract rights requires a closer inquiry into the scope of the statute as explained in *Patterson* and its progeny.

*Patterson* described actionable interference with the enforcement of contracts as "discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race." 491 U.S. at 177, 109 S.Ct. at 2373. However, consistent with *Runyon's* rule that § 1981 covers discrimination by private actors, *Patterson* states unambiguously that *private* efforts to block the enforcement of rights established by contract violate the statute, and the decision makes specific reference to § 1981's coverage of labor unions:

> [§ 1981] also covers wholly *private* efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of a contract.

*Id.* (emphasis in original).

This Court has distinguished those cases in which § 1981 permits an action to enforce non-discriminatory contracting from cases where a plaintiff may have recourse to federal anti-discrimination laws like Title VII but may not invoke § 1981. In *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir.1989), we explained that enforcement of established contract rights through the legal process is covered under § 1981 when the contract itself secures the right in question either expressly or by implication. *Id.* at 112. There we denied a claim for interference with the enforcement of a contract where the employment con-

tract in question did not contain a promise by the employer not to discriminate, and state law did not create an implied term outlawing discrimination in every contract of employment. *Id.* In explaining why an action for enforcement did not lie, we distinguished the employment contract in *McKnight* from the one in *Goodman v. Lukens Steel Co.*, 482 U.S. at 656, 107 S.Ct. at 2617, where the Supreme Court upheld a § 1981 enforcement action, because "the collective bargaining contract contained an express clause binding both the employer and the Unions not to discriminate on racial grounds." *Id.* at 666, 107 S.Ct. at 2623.

Needless to say, the collective bargaining agreement in this case is more like the one in *Goodman v. Lukens Steel Co.* than the one in *McKnight.* By filing grievances, plaintiff made efforts throughout the limitations period of the § 1981 claim to enforce Local 597's express contractual obligation to provide all union members with an equal opportunity to obtain referrals regardless of race. As the record shows, Daniels' efforts were for naught, and his union consistently and intentionally withheld referrals from him on account of his race. Given that the non-discrimination clause was an express provision of the collective bargaining agreement, Local 597 was properly held liable as a matter of law for interference with the plaintiff's attempt to enforce contract rights.

2. Plaintiff's expulsion from Local 597

Local 597's interference with plaintiff's ability to enter into contracts with employers suffices to uphold the general verdict of liability under § 1981. However, the parties dispute whether *Patterson* and its progeny affect plaintiff's claim that his expulsion from the union stated a cause of action under § 1981.

■ Because the lower courts have attempted to define the extent to which *Patterson* preserves a cause of action for conduct extending beyond the formation of contracts, it is worth clarifying where expulsion from the union fits in the *Patterson* framework. We must decide whether plaintiff's expulsion is actionable with ref-

erence to the collective bargaining agreement, for it is this contract containing the non-discrimination clause that the plaintiff attempts to enforce. Plaintiff attempts to characterize the expulsion differently, arguing that it effectively impedes his ability to enter into contracts with prospective employers, because his expulsion prevents him from obtaining referrals. However true this might be as an empirical matter, it cannot be accepted as a basis for imposing § 1981 liability, for fear of making an end run around *Patterson's* holding. To describe the expulsion as an impediment to referrals is to focus on conduct that occurred after the formation of the original contract—here the collective bargaining agreement. *Patterson* excludes from the coverage of § 1981 discriminatory conduct occurring after the contract is entered into. In *Patterson,* the post-formation conduct that was held not to be actionable was racial harassment. 491 U.S. at 179–180, 109 S.Ct. at 2374. Decisions interpreting *Patterson* have applied the same principle to exclude claims of discriminatory termination from the ambit of § 1981. *Baker v. Elmwood Distrib., Inc.,* 940 F.2d 1013, 1016 (7th Cir.1991); *McKnight,* 908 F.2d at 108–109; *Taggart v. Jefferson County Child Support Enforcement Unit,* 935 F.2d 947 (8th Cir.1991) (*en banc*), overruling *Hicks v. Brown Group, Inc.,* 902 F.2d 630, 635–638 (8th Cir.1990); *Carroll v. General Accident Ins. Co.,* 891 F.2d 1174 (5th Cir.1990); *Lavender v. V & B Transmissions & Auto Repair,* 897 F.2d 805, 808 (5th Cir.1990); *Courtney v. Canyon Television & Appliance Rental, Inc.,* 899 F.2d 845, 849 (9th Cir.1990). Without more, this particular justification for bringing expulsion within § 1981's ambit must fail. Post-formation discrimination will often have the effect of depriving an aggrieved party of opportunities to enter into new contracts. For example, an employee who is discharged has obviously lost the chance to be promoted to a higher position. The discriminatory failure to promote might in and of itself be actionable under § 1981 if it is a "new and distinct relation," *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377, but the fact that the employee didn't have the opportu-

nity to be promoted does not make his termination actionable. Otherwise the prospective loss of an opportunity to contract could virtually always be invoked as a basis for applying § 1981 to post-formation conduct. *Patterson* makes clear that this hypothetical interference with contract formation fails to fall within the scope of § 1981.

■ Fortunately for Daniels, he did not rely solely on a post-formation theory in arguing that his expulsion violated the statute. He has characterized his expulsion as racially discriminatory retaliation. If § 1981 post-*Patterson* provides a remedy for plaintiff's expulsion, it does so because the expulsion is in retaliation for Daniels' efforts to bring Local 597 into compliance with the non-discrimination clause of the collective bargaining agreement. While we have recognized on at least four occasions that an action for retaliation under § 1981 potentially survives *Patterson, Mozee v. American Commercial Marine Serv. Co.,* 940 F.2d 1036, 1051–52 (1991); *Bailey v. Northern Indiana Pub. Serv. Co.,* 910 F.2d 406, 411 (7th Cir.1990); *McKnight,* 908 F.2d at 111–112; *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1313 (1989), we have not yet actually held a defendant liable for retaliation. See also *Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527, 1535 (11th Cir.1990) (recognizing that an employer's retaliatory conduct is actionable under § 1981 "when the employer aims to prevent or discourage an employee from using legal process to enforce a specific contract right"). In *Malhotra,* we first suggested that retaliation might be actionable, where the retaliation was racially motivated and interfered with a plaintiff's ability to make or enforce contracts on the same footing as white persons. 885 F.2d at 1313. However, we did not decide whether § 1981 covered the retaliation against plaintiff Malhotra, because his employer offered uncontested evidence that he was fired due to poor job performance. *Id.*

In *McKnight,* we took a more decisive stand, concluding that where the employer retaliates or threatens to retaliate in order to interfere with an employee's attempt to enforce a right established in a contract, the employer's action falls within the scope of § 1981, so long as the retaliation had a racial motivation. 908 F.2d at 111. However, we concluded that the plaintiff in *McKnight* failed to make out a retaliation claim, because the employment contract in question contained no contractual promise not to discriminate against him. To the extent that the retaliation was in response to plaintiff McKnight's complaints of discrimination, he asserted rights that were protected by federal anti-discrimination law, and not by the employment contract. *Id.* at 112.

Most recently, in *Mozee,* this Court restated the viability of a retaliation claim under § 1981 in cases where a plaintiff attempts to enforce rights guaranteed in the contract through the legal process or through some non-judicial method of adjudication. *Mozee,* 940 F.2d 1036, 1052. However, the retaliation in that case was in response to the plaintiffs' participation in the "Black Days," a series of demonstrations protesting treatment of blacks at the defendant's plant. Despite its recognition that retaliation claims survived *Patterson,* the Court reversed the finding of retaliation in violation of § 1981, because there was no finding that the plaintiffs' participation in the Black Days demonstrations represented their effort to enforce contract rights. *Mozee,* 940 F.2d 1036, 1052–53.

Under the law of our Circuit since *Patterson,* for the retaliation to be actionable under § 1981, *McKnight* requires that the retaliation itself be racially motivated. 908 F.2d at 112. In other words, if a white union member filed grievances alleging racial discrimination against black members, and Local 597 retaliated in the same way by expelling him, then that retaliation against a white would not be racially motivated within the meaning of § 1981. The rule of *McKnight* in effect creates a double causation requirement in order for retaliation to be actionable under § 1981. First the plaintiff must show that the defendant interfered with his right to enforce the contract on account of race. Second, the plaintiff must then show that the retaliation itself had a racial motivation.

In his instructions to the jury, the district judge, through no fault of his own, read an instruction that fails to set forth the framework explained in *McKnight* in order for retaliation claims to survive. His instruction explained the law as it existed before *Patterson*, permitting the jury to impose liability where Local 597 retaliated against Daniels, simply because he filed charges:

> The plaintiff also claims that defendant violated Section 1981 of Title 42 of the United States Code by retaliating against him, because he filed race discrimination charges or because he participated in investigation, proceedings or hearing regarding such charges against the defendant.
>
> To prove this claim, *the plaintiff must prove, by a preponderance of the evidence, that the defendant expelled plaintiff from the union for filing these charges.*
>
> Plaintiff must prove that the defendant intentionally acted to retaliate against him.
>
> In order for the plaintiff to recover on his claim against the defendant, plaintiff must prove the following essential elements by a preponderance of the evidence: First, that the plaintiff was engaged in protective activities, that is, filed discrimination charges against the defendant, or participated in an investigation, proceedings or hearing regarding such charges; second, that the plaintiff was expelled from the union; and third, that there was a causal link between the protective activity and his expulsion from the union.

Jury Instruction No. 2 (Tr. 1939–1940) (emphasis added). Although Local 597 made no objection to the instruction at trial, it claims on appeal that the jury instruction misstates the law after *Patterson*.

Normally, Rule 51 of the Federal Rules of Civil Procedure requires that a party object to an instruction at trial if it wishes to preserve the issue for appeal. See Fed. R.Civ.P. 51. However, we have in the past recognized a narrow exception to this rule in situations "where an intervening Supreme Court case changes the law while appeal is pending. * * * This rule is a corollary to the general rule that an appellate court should apply the law as it exists at the time of appeal." *Brown v. M & M/Mars*, 883 F.2d 505, 512 (7th Cir.1989), citing *General Beverage Sales Co. v. East-Side Winery*, 568 F.2d 1147, 1152–1153 (7th Cir.1978). While Local 597 is plainly wrong that the change in the law precludes all claims for retaliation under § 1981, *Patterson* and its progeny have made it more difficult for plaintiffs to bring a successful retaliation claim. As noted above, this Court's decision in *McKnight* recognized that the retaliation itself must be racially motivated. The jury instruction here does not require the jurors to make this additional finding in evaluating the retaliation claim. Thus if retaliation were the only basis on which the jury entered its verdict in favor of Daniels, we would remand the retaliation claim to the jury for reconsideration in light of the law as it has changed since *Patterson*. However, Local 597's discrimination in the formation of contracts with employers and discrimination in enforcement of the collective bargaining agreement provide independent bases for affirming the finding of liability under § 1981.

Although retaliation claims survive *Patterson*, we are required to join *Malhotra*, *McKnight*, and *Mozee* in stopping short of imposing liability for retaliation in this case. While the plaintiff has been led to the mountaintop, this Court cannot lead him into the promised land. Because we have recognized that retaliation is actionable but have stopped short of imposing liability, it is useful to illustrate the sort of showing required to bring a successful claim. If the jury were to be instructed according to the two-pronged inquiry mandated by *McKnight*, then it could find in Daniels' favor on the retaliation claim if it evaluated the evidence in the following manner. Daniels' expulsion followed an internal disciplinary hearing before the union's disciplinary board at which he was found "guilty beyond a reasonable doubt" of playing his radio too loudly and of striking LaBanca, one of the Business Agents

responsible for depriving Daniels of referrals. While Local 597 believes that the fight and the subsequent finding of guilt provided it with a race-neutral reason for expelling Daniels, the plaintiff views events in a distinctly different light. He claimed at trial that the internal disciplinary process was infected with and motivated by racial discrimination, and that he would not have been expelled had he not attempted on many occasions to file grievances against Local 597 for its discrimination against him on account of his race.

From the plaintiff's perspective then, the altercation with LaBanca provided Local 597 with a pretext for expelling him from the union. In fact, throughout his membership in the union, plaintiff filed numerous complaints with the union and with federal and state agencies complaining of racial discrimination in referrals. After the fight, the executive committee allowed Business Agent LaBanca to file charges against Daniels, and then held a hearing at which Kenneth Lee, a union official who had made racist comments to plaintiff in the past, presided. Lee would not recuse himself from the hearing, and the hearing itself was plainly lopsided in favor of LaBanca. The executive committee barred several of Daniels' witnesses from testifying, and in concluding that Daniels was "guilty beyond a reasonable doubt" of playing his radio too loudly and striking LaBanca, the tribunal claimed that Daniels presented no evidence in his defense. In fact, Daniels had attempted to show that the facts of the fight were not so clear as LaBanca painted them, and plaintiff wished to file his own internal grievance, but was not even permitted to do so. That the hearing was a pretext and a sham is borne out further by Daniels' acquittal by a criminal court jury for the very same charge. Even though a court of law acquitted him, the executive committee made no adjustment in his penalty—providing further evidence that the hearing was a device used by the union to force plaintiff out.

As to the racial motivation behind the retaliation itself, plaintiff would argue that the record is devoid of evidence that Local 597 retaliated against any white union member by expelling him. On the contrary, the evidence introduced by Daniels indicates that Daniels' race was foremost on the minds of the executive committee as it mounted his disciplinary hearing. Local 597 singled out Daniels, refused to allow him or any of his supporters to present plaintiff's side of the story concerning the fight, and finally expelled him when the pretext of the fight presented itself—all on account of Daniels' race. If the jury were instructed as to the proper legal standard and were to accept plaintiff's version of the facts, his retaliation claim would provide a viable alternative basis for upholding liability under § 1981. It would, of course, be up to the jurors to weigh the evidence presented by plaintiff and to determine whether it supported liability under § 1981 for retaliation.

3. Local 597's duty of fair representation

Local 597 next attacks the jury's verdict on Daniels' § 301 claim, arguing that § 301 of the Labor–Management Relations Act (29 U.S.C. § 185) does not support an action by a union member against his union. Section 301 provides for:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter * * * may be brought in any district court of the United States having jurisdiction of the parties * * *.

The statute not only imposes the responsibility for adhering to labor contracts on the employer, but also upon:

(b) Any labor organization which represents employees in an industry affecting commerce * * *. Any such labor organization may * * * be sued as an entity and in behalf of the employees whom it represents in the courts of the United States.

§ 301 (29 U.S.C. § 185). According to Local 597, a § 301 suit is an action in contract brought against an employer who has violated the terms of a collective bargaining agreement and does not apply to internal union matters such as the expulsion of a union member. In response, Daniels as-

serts that he properly brought his suit under § 301, since it provides a jurisdictional basis for his claim that Local 597 breached its duty of fair representation by discriminating against him because he is black. The confusion here arises as a result of the parties' respective understandings of the proper legal label for a suit brought by an employee against his union. Daniels' lawsuit is only a § 301 suit if the defendant breached its duty of fair representation under the terms of the collective bargaining agreement. If the claim does not arise out of the collective bargaining agreement, then the fair representation claim must rest on an alternative jurisdictional basis.

■ A brief summary of the development of the doctrine of the duty of fair representation bears repeating to dispel the parties' confusion about how the duty fits into the remedial scheme for redress of a union member's grievance against his union.[4] A union's duty to represent fairly all employees attaches only when, as here, the union is the exclusive representative of employees in a collective bargaining unit. The duty is a judicially created creature of federal common law whose shape has been influenced most heavily by the Supreme Court. Initially, the duty took the form of a negative command against labor unions not to discriminate against their members on the basis of race. *Steele v. Louisville & N.R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; *Tunstall v. Brotherhood of Locomotive Firemen and Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187. However, in the seminal case establishing the modern contours of the duty, *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842, the Court recognized that the duty in its original form included "the statutory obligation to serve the interests of all members [of the collective bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* at 177, 87 S.Ct. at 910. Additionally, the Court proceeded to elaborate upon the content of the duty, broadening

its scope in the context of § 301 breach of contract actions. *Id.* at 187, 87 S.Ct. at 915. *Vaca* inaugurated the duty as a general standard of union conduct for which a union would be in breach when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916.

Since *Vaca*, suits for the breach of the duty of fair representation against the union and § 301 suits against an employer for violation of the collective bargaining agreement have proceeded alongside each other. These so-called hybrid suits, though formally distinct, are inextricably interdependent. *Olsen v. United Parcel Serv.*, 892 F.2d 1290, 1293 (7th Cir.1990); *Thomas v. United Parcel Serv., Inc.*, 890 F.2d 909, 914 (7th Cir.1989). Indeed, *Vaca* recognized that courts, in order to entertain a § 301 suit against an employer, will first have to consider whether the union has breached its duty of fair representation. 386 U.S. at 187–188, 87 S.Ct. at 915. The reason for this is plain. Most collective bargaining agreements include provisions for the arbitration of a union member's grievances against his employer and require the union member to pursue grievances through the arbitral channels established in the agreement. When the union bound by an arbitration clause, however, refuses to process the member's grievance, and this failure is due to the union's intentional misconduct, *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 521 (7th Cir.1981), then the union member has a cognizable claim for breach of the union's duty of fair representation. The aggrieved union member may then pursue both claims—the claim for breach of the duty of fair representation against the union, and a § 301 claim for breach of the employer's contractual obligations under the collective bargaining agreement. *Thomas*, 890 F.2d at 916–917.

■ Because the courts have required that union members bring hybrid suits if they wish to sue their employers under § 301, Local 597 apparently thinks that the

---

**4.** For a comprehensive treatment of the duty of fair representation, see Martin H. Malin, Individual Rights Within the Union 348–493 (1988).

obligation to bring a hybrid fair-representation suit runs in both directions. This is simply not the case. In *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388, the Supreme Court held that an employee who alleged that his union breached its duty of fair representation in intentionally failing to refer him for jobs through the union hiring hall did not have to sue the employer under § 301 in order to press his claim against the union. 493 U.S. at 80–83, 110 S.Ct. at 433–34. The Court explained that a suit against the employer is not a prerequisite to a suit against the union:

> While in *Vaca* an allegation that the union had breached its duty of fair representation was a necessary component of the § 301 claim against the employer, the converse is not true here: a suit against the union need not be accompanied by an allegation that an employer breached the contract, since whatever the employer's liability, the employee would still retain a [fair representation] claim against the union.

*Id.* at 82–83, 110 S.Ct. at 434. Where the union has thus assumed contractual duties to its employees through a collective bargaining agreement, § 301 provides a jurisdictional basis for the fair representation claim against the union.

In *Lewis v. Local Union No. 100 of Laborers' Int'l Union*, 750 F.2d 1368 (7th Cir.1984), decided before *Breininger*, we held that an employee may bring a claim for breach of the duty of fair representation even when it is not accompanied by a § 301 suit against the employer. *Id.* at 1376–1377. We also recognized that 28 U.S.C. § 1337, which establishes district court jurisdiction over suits arising under statutes regulating interstate commerce, provides an independent jurisdictional basis for a "bare" fair representation claim against the union even where the employee fails to allege breach of contract by the union under the terms of the collective bargaining agreement. *Id.* at 1375 n. 7; *Breininger*, 493 U.S. at 83, 110 S.Ct. at 434–35 ("We have always assumed that

independent federal jurisdiction exists over fair representation claims because the duty is implied from the grant of exclusive representation status, and the claims therefore 'arise under' the [National Labor Relations Act]"). Despite this recognition, in *Lewis* we found that § 301 provided a jurisdictional basis for the employee's claim that the union discriminated against him in failing to refer him through the union hiring hall, because the collective bargaining agreement established the union's exclusive right to refer employees.

■ For plaintiff to call his claim a § 301 suit is therefore not exactly a misnomer, but Daniels has not been as precise as he could have or should have been. Section 301 provided the jurisdictional basis for the suit alleging a breach by Local 597 of its duty of fair representation. Plaintiff uses § 301 and the duty of fair representation interchangeably, when the former provides jurisdictional support to the latter and his suit against Local 597 is properly called a fair representation suit. Although 28 U.S.C. § 1337 provides a jurisdictional basis for a "bare" fair representation suit against Local 597, as we make clear in our above discussion of Local 597's liability under § 1981, the collective bargaining agreement imposes a contractual obligation on Local 597 not to discriminate either in job referrals or in the processing of a union member's grievances. Therefore, the contractual obligation imposes a concomitant duty of fair representation on the union. See *International Brotherhood of Elec. Workers v. Hechler*, 481 U.S. 851, 860, 107 S.Ct. 2161, 2167, 95 L.Ed.2d 791 (recognizing that a labor union "may assume a responsibility towards employees by accepting a duty of care through a contractual agreement").

■ Although Daniels' complaint may not have been a model of artful pleading, Local 597 does not claim on appeal that the complaint should have been dismissed, and we construe the allegations of a complaint liberally. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Lewis*, 750 F.2d at 1373. It is irrefutable that the allegations of plaintiff's suit

claimed a violation of Local 597's duty of fair representation, and that the jury found Local 597 to be in breach of this duty. In *Breininger*, the Supreme Court recognized that discriminatory operation of a union hiring hall states a claim for breach of the duty of fair representation. 493 U.S. at 75, 110 S.Ct. at 430. We have recognized previously that intentional discrimination by a union in the operation and administration of a job referral system violates the union's duty of fair representation. *NLRB v. Local 139, Int'l Union of Operating Eng'rs*, 796 F.2d 985, 992–993 (7th Cir.1986).[5] There is no need to revisit the evidence that Local 597 violated its duty of fair representation to plaintiff. The record is rife with evidence that the union intentionally discriminated in the operation of its referral system and intentionally ignored his many grievances. Therefore the jury acted reasonably and well within its discretion in finding that Local 597 violated its duty of fair representation.

■ Local 597 argues finally that even if Daniels asserted a cognizable claim that it breached its duty of fair representation pursuant to § 301, plaintiff's claim is barred by the six-month statute of limitations applicable to such suits. Plaintiff correctly accepts that the six-month statute of limitations applies. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 155, 103 S.Ct. 2281, 2285, 76 L.Ed.2d 476 (deriving six-month statute of limitations from § 10(b) of National Labor Relations Act and applying it to hybrid § 301/fair representation claims). The disagreement arises over when the limitations period begins to run. Local 597 argues that the limitations period is tolled by the date plaintiff was first expelled from the union—September 6, 1983. Daniels did not file his claim until June 20, 1984, more than six months later. Plaintiff responds that the relevant accrual date is February 1, 1984, the date on which plaintiff's request for review to the International Union was denied and his expulsion was upheld.

Daniels' claim was timely under our previous decisions, for the limitations period did not commence until February 1, 1984, the date that he had exhausted his internal appeals within the union. As this Court has recognized previously, "a section 301/fair representation claim usually accrues from the time a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers * * * that no further action would be taken on his grievance." *Martin v. Youngstown Sheet & Tube Co.*, 911 F.2d 1239, 1246 (7th Cir. 1990), quoting *Richards v. Local 134, Int'l Brotherhood of Elec. Workers*, 790 F.2d 633, 636 (7th Cir.1986); *Frandsen v. Brotherhood of Railway, Airline and Steamship Clerks*, 782 F.2d 674, 681 (7th Cir. 1986) (six-month statute of limitations commences to run only when union procedures are exhausted, even when the internal grievance procedure proves to be futile). Our recognition that the limitations period does not begin to run until internal union appeals are exhausted makes eminent sense. A rule that starts the clock ticking earlier would present a substantial disincentive to union members to pursue internal remedies, a result that would be entirely inconsistent with national labor policy. See *Frandsen*, 782 F.2d at 681. Moreover, it would frustrate the Supreme Court's purpose in *DelCostello* of granting the union member a six-month period in which to file his claim in order to ensure that he has enough time to retain counsel and evaluate the adequacy of the union's representation. *Id.* at 682.

### 4. Plaintiff's Title VII claim

■ As to the district judge's determination that the discrimination by Local 597 against Daniels violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2), the union argues for reversal

---

**5.** Because Daniels stated a valid claim against Local 597 for violation of its duty of fair representation, we need not linger over defendant's claim that a new trial should be ordered because two of the district court's jury instructions were in error. Daniels' expulsion and the failure by the union to process plaintiff's grievances both gave rise to a cognizable claim that Local 597 breached its duty of fair representation. Therefore, the jury instructions below did not prejudice defendant.

because the judge did not make independent findings of fact, relying instead on the jury's verdict on the § 1981 and fair representation claims. In urging this position, the defendant by its own admission invites us to revisit our prior holding that a jury's verdict, when § 1981 and Title VII claims are tried simultaneously, binds the judge on factual issues common to both claims. *McKnight*, 908 F.2d at 113; *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1293–1294 (7th Cir.1987); *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1421 (7th Cir.1986); see also *Wade v. Orange County Sheriff's Office*, 844 F.2d 951 (2d Cir.1988); *Lincoln v. Board of Regents*, 697 F.2d 928, 934 (11th Cir.1983), certiorari denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102. This rule is well settled, and we decline to disturb it here. Moreover, even where we concluded in *McKnight* that a plaintiff's successful § 1981 claim must be reversed because of *Patterson*, the Court held that the jury's fact-finding on issues common to the jury and to judge-tried claims is dispositive. *McKnight*, 908 F.2d at 112–113. As further justification for the continued application of this rule, we recognized that a remand would serve no purpose, for it would add nothing to the comprehensive record already before the appellate court. *Id.* at 113, citing *Mallory v. Citizens Utils. Co.*, 342 F.2d 796 (2d Cir.1965).

This case is even clearer than *McKnight*, for the jury's verdict on the § 1981 claim survives *Patterson* (although the rationale is now more precise) and its verdict on the fair representation claim remains entirely undisturbed. Therefore, the jury's findings concerning Local 597's intentional discrimination against plaintiff provide a basis for the equitable relief awarded to him by the district judge under Title VII.[6]

■ Local 597 also challenges the evidentiary basis for the district judge's conclusion that the union violated Title VII due to the disparate impact of its hiring practices on blacks. To make out a *prima facie* case of discrimination under a theory of disparate impact, a plaintiff must identify the specific employment practice that is challenged. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827. Then plaintiff must offer statistical evidence to show that the employment practice in question caused the exclusion of individuals on account of membership in a protected group. *Id.* In the leading case establishing a theory of disparate impact as a basis of recovery under Title VII, *Griggs v. Duke Power*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, the Supreme Court found a violation where "requirements operate to disqualify Negroes at a substantially higher rate than white applicants." *Id.* at 426, 91 S.Ct. at 851.

Although the district court adopted the jury's findings of fact, it made additional findings of its own sufficient to support liability under a theory of disparate impact. The court credited the testimony of the statistical expert, Thomas DiPrete of the University of Chicago, who testified on plaintiff's behalf. He examined the disparity in the rate of referrals and arrived at figures for the years covered by the Title VII suit. In 1981, two-thirds of the referrals went to whites, while one-third of the referrals went to blacks. In 1983, the disparity increased, so that blacks received only fifteen percent of the referrals. And in 1984, blacks received only fourteen percent of the referrals, despite the fact that thirty to fifty percent of the Local 597 members present at the hall were black.[7]

6. Local 597 makes an additional attempt to sever the connections between the jury verdict and the Title VII claim by asserting that the Title VII 300-day statute of limitations excluded from the district court's consideration discriminatory incidents occurring in 1981 and 1982, several years before plaintiff filed his lawsuit. A litigant's objection to the statute of limitations is an affirmative defense that must be raised in order to be preserved. See *McMahon v. Eli Lilly*

*& Co.*, 774 F.2d 830, 836–837 (7th Cir.1985). Here Local 597 waived any objection to the period covered by Title VII, for it did not object when the plaintiff proposed and the district court found that the statute covered claims after October 8, 1980 (Pleading Vol. 2, No. 138).

7. The district court did not include figures for 1982, because DiPrete did not analyze the figures for that year due to a "typographical error"

DiPrete concluded that the probability that this disparity in referrals would arise by chance was less than one in a trillion for the year 1981. As the Supreme Court has recognized, it takes only five percent or less probability that the disparity results from chance to state a disparate impact claim under Title VII. *Castaneda v. Partida,* 430 U.S. 482, 496–497 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498; see also *Mozee,* 940 F.2d 1036, 1043 n. 7; *Mister v. Illinois C.G.R.R.,* 832 F.2d 1427, 1437 (7th Cir.1987), certiorari denied, 485 U.S. 1035, 108 S.Ct. 1597, 99 L.Ed.2d 911; *Coates v. Johnson & Johnson,* 756 F.2d 524, 537 n. 11 (7th Cir.1985).

Contrary to the suggestion by Local 597, the district court explicitly reviewed DiPrete's conclusions as to the statistical disparities in referrals and found his testimony to be "concise, very credible and uncontroverted" (R. 203 at 6–7). In the view of the district court, Daniels made out a *prima facie* case of disparate impact discrimination under Title VII. Because Local 597 argues that the district court failed to make findings of fact at all, the union does not claim that the district court's findings were in error. However, even were we to review the findings, the scope of our review would be limited, for we may overturn only those findings that appear to be clearly erroneous. *Mozee,* 940 F.2d 1036, 1044; *EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 309 (7th Cir.1988).

 In addition to the district judge's findings as to plaintiff's disparate impact theory, the district court also made findings sufficient to sustain Daniels' claim of racial harassment due to a hostile work environment under Title VII. In *Patterson,* the Supreme Court held that racial harassment is not covered by § 1981, but the Court reaffirmed its prior holding in *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, that "such conduct is actionable under the more expansive reach of Title VII of the Civil Rights Act of 1964." *Patterson,* 491 U.S. at 180, 109 S.Ct. at 2374. This Court has also recognized that

in the summaries prepared by plaintiff's counsel.

Title VII provides a basis for an independent claim of racial harassment. *E.g., Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1270 (7th Cir.1991); *Malhotra,* 885 F.2d at 1308; *Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1380 (7th Cir.1986), certiorari denied, 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819; *Hunter v. Allis–Chalmers,* 797 F.2d at 1420.

When the district judge properly applies the correct legal standards for finding racial harassment due to a hostile work environment (there is no indication that he failed to do so here), the clear error rule must be applied to his findings. *Daniels v. Essex Group,* 937 F.2d at 1269; *Starks v. George Court Co., Inc.,* 937 F.2d 311, 315 (7th Cir.1991). But since Local 597 claims that the district court made no findings at all, it has essentially forfeited any argument that the findings made at the Title VII bench trial were clearly erroneous. Here the district judge found in no uncertain terms that Daniels was subjected to discrimination by the Business Agents responsible for referrals. Judge Alesia credited the testimony of Daniels' fellow union members, James Ferguson, Frank Craddieth and Ronald Chopp (R. 103 at 7). Therefore, the evidence sufficed to sustain Daniels' claim of racial harassment under Title VII.

**B.** *Plaintiff's Cross–Appeal*

 Daniels cross-appealed asking this Court to award him prejudgment interest and pension credits. This Court has stated previously that, as a general matter, prejudgment interest is "presumptively available to victims of federal law violations." *Gorenstein Enters., Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989). In cases involving violations of the federal civil rights laws, prejudgment interest is available as a matter of course on an award of backpay, *Williamson v. Handy Button,* 817 F.2d at 1297, so long as this amount is "readily determinable." *Id.* at 1298.

 Here the jury returned a general verdict that awarded $181,063.50 in com-

pensatory damages. Some portion of this award comprised backpay, while the rest compensated Daniels for his emotional distress. We suggested in *Williamson v. Handy Button*, that where the district judge determines that it was too hard to figure out what the jury awarded as backpay, a civil rights plaintiff may not be entitled to prejudgment interest. 817 F.2d at 1299. Because the jury awarded a general verdict in Daniels' favor, the district judge had no way of reading the minds of the deliberating jurors to determine how they arrived at the final, comprehensive amount. As the district judge noted, the award of compensatory damages for emotional distress is highly subjective, and the jurors may well have rested the lion's share of its award on this aspect of the injury. See *Hunter v. Allis–Chalmers*, 797 F.2d at 1425.

Plaintiff attempts to convince us that the amount of backpay is readily ascertainable, by presenting his own calculation of wage loss, which incidentally is slightly less than the amount originally claimed by plaintiff—$109,000. However, it was within the province of the jury to determine the amount of compensatory damages and to include the amount of backpay it believed was due to plaintiff in its award. Moreover, a district judge's decision to deny an award of prejudgment interest is reviewed according to an abuse of discretion standard. *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 820 (7th Cir.1990); *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 411 (7th Cir.1989), affirmed, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834. By denying Daniels prejudgment interest, we do not mean to suggest that the amount of backpay must be determined down to the last penny. On the contrary, we have previously recognized that it is virtually impossible to determine the amount of backpay with absolute certainty. *Williamson v. Handy Button*, 817 F.2d at 1299. Nevertheless, when a plaintiff presents a district judge with a claim for prejudgment interest, he must have some basis on which to conclude that backpay accounts for some minimum amount of the compensatory damage award. Because the district judge

has no means to parse the elements of the general verdict, prejudgment interest must be denied.

■ Since Daniels failed to produce evidence that he was entitled to any other benefits besides wages, the district court denied him damages for lost pension benefits. Plaintiff claims on cross-appeal that the district judge should have awarded pension credits because the collective bargaining agreement provided that employers are to contribute to the pension fund for each straight time hour worked by hourly employees. (Article III, Section 3 of Area Collective Bargaining Agreement at Plaintiff's Br.App. 16). Because the district court found that plaintiff worked 2100 hours per year, Daniels argued that he should have been awarded a corresponding amount of pension credits. Despite the fact that plaintiff worked for 2100 hours, the Agreement simply states that an appropriate amount of pension benefits will be "determined from time to time through negotiations." (*Id.*). It provides no mechanism for calculating this amount, and the plaintiff produced no evidence to substantiate his claim. Therefore, the district judge did not abuse his discretion in denying Daniels' claim to pension credits.

## III. CONCLUSION

As this Court's analysis makes clear, Daniels has "successfully negotiate[d] the shifting shoals of present-day federal employment discrimination law." *Malhotra*, 885 F.2d at 1313. He had help, however, from Local 597, whose Business Agents made plaintiff the brunt of its intentionally discriminatory practices. Faced with a substantial jury verdict against it in the amount of $331,000, Local 597 seeks to transform § 1981 from a sword into a shield, claiming that the Supreme Court's decision in *Patterson* protected the union from liability to Daniels. However, as concluded above, Daniels' case did not disintegrate with *Patterson*, for he alleged discriminatory conduct by Local 597 that fell squarely within the admittedly shorter reach of § 1981. That § 1981 post-*Patterson* no longer covers discriminatory con-

duct after the formation of a contract does not mean that § 1981 is a toothless remedy. When the discriminatory conduct interferes with the making and enforcement of contracts as in this case, § 1981 still has plenty of bite. Therefore, the jury's verdict as to plaintiff's § 1981 claim (in light of our explanation of the law after *Patterson*) and as to plaintiff's fair representation claim must be affirmed. Accordingly, the jury's award of $181,063.50 in compensatory damages and $150,000.00 in punitive damages will remain undisturbed, as will the district court's award of attorneys' fees and costs.

JUDGMENT AFFIRMED.