**CERTIFIED MIDWEST, INC., Plaintiff,**

**v.**

**LOCAL UNION NO. 738, INTERNA-
TIONAL BROTHERHOOD of
TEAMSTERS, Defendant.**

No. 86 C 6061.

United States District Court,
N.D. Illinois, E.D.

March 17, 1988.

S. Richard Pincus, Fox & Grove, Chicago, Ill., for plaintiff.

Marvin Gittler and Barry M. Bennett, Asher, Pavalon, Gittler & Greenfield, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, Chief Judge.

Defendant Local Union No. 738, International Brotherhood of Teamsters ("Union") has submitted a proposed judgment order, and plaintiff Certified Midwest, Inc. ("Certified") objects to that order. The Union is directed to submit a second proposed judgment order consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

The issue now before the court is the amount of back pay due to enforce an arbitral award. In our two previous opinions we ruled that an arbitrator's decision that plaintiff Certified had improperly discharged its employee Stan Price ("Price") had not been procured by Price's fraudulent testimony and that the award reinstating Price without back pay should be enforced. *Certified Midwest, Inc. v. Local Union No. 738*, No. 86 C 6061, Memorandum Op. (N.D.Ill. May 4, 1987) [available on WESTLAW, 1987 WL 4941]. We also ruled

> that Price is entitled to back pay from the date he should have been reinstated (April 12, 1986) to the date of his reinstatement (June 7, 1987). Amounts received by Price, if any, from other employment during that period are to be subtracted from the back pay amount. Price is also entitled to the legal rate of interest on the back pay amount.

*Certified Midwest, Inc. v. Local Union No. 738*, No. 86 C 6061, Memorandum Op. at 8–9 (N.D.Ill. Sept. 17, 1987) ("Sept.Op.") [available on WESTLAW, 1987 WL 17470].

*Price's Earnings History*

The parties agree that had Price been employed by Certified for ordinary forty-hour weeks during the entire back pay period, he would have received a gross pay of $31,306.00. Memorandum on Behalf of Local Union No. 738 In Support of Proposed Judgment Order at 2 ("Union Support Mem."); Plaintiff's Memorandum in Opposition to Defendant's Proposed Judgment Order at 9 ("Pl.Opp."). His average wage, therefore, would have been about $13.00 an hour. The union states, and Certified has not disputed, that Certified would have contributed $1,200.00 to Price's pension fund, and $2,232.34 to his health and welfare fund during that period. *See id.*

According to the Union, Price's earnings during the back pay period totaled $6,736.95.[1] *Id.*

Certified states, and the Union has not disputed, that Price drew $9,234.00 in unemployment compensation during the back pay period. The parties' dispute centers on the extent to which Price made proper efforts to mitigate his damages. The issue concerns the period during which Price was employed at Normaxcorp, doing business as BJ's Wholesale Club ("BJ's"). According to Price's deposition, in February 1986 he began working for BJ's as a full-time employee and received $5.00 per hour.[2] 1986 Price Deposition at 5. On March 11, 1986, Price began full-time employment with Sovereign Oil Co. Some time between March 11 and March 17, Price voluntarily reduced his hours at BJ's to part-time. He continued to hold one full-time and one part-time job until he was laid off by Sovereign Oil Co. on April 9 due to lack of work. Exhibit G to Union Support Mem. (letter of Sovereign Oil Co. Bookkeeper Yvonne Jasinski).

Price held only a part-time job with BJ's between April 9 and December 9. He testified that he did not seek a return to full-time status at BJ's because full-time employment would have interfered with his attempts to find a new job that would pay higher wages. Indeed, Price represents that he diligently sought higher-paying work:

---

1. Plaintiff does not appear to contest this figure. It lists a total of only $4,946.95 in interim earnings. Exhibit 6 to Pl.Opp.

2. Subsequently Price's salary was raised to $5.30 per hour.

Throughout the time I was unemployed, I did everything possible to obtain employment and earn a living. In addition to myself, I had to help support my wife and two children.... [E]xcept for the cold storage job which I felt unable to perform, I only quit jobs because I believed that I had other jobs which would pay me more money. I looked for work at all times that I was not employed, and I continued looking for better jobs even when I was working. While not all of my job changes worked out as I hoped when I made them, my desire at all times was to get work which would pay the highest amount so that I could support myself and my family.

Price Affidavit at ¶ 15.

Certified argues that Price's deposition testimony is more consistent with another story:

[F]or almost eight months Price voluntarily worked part-time at BJ's, when he could have worked full-time.

The reason for this is obvious. Once Price was laid-off from Sovereign Oil on April 9, 1986, he was then eligible, based upon his employment at Sovereign, to receive unemployment compensation even though he was employed part-time at BJ's. Aware that he could receive unemployment compensation in amounts up to $200.00 per week, Price saw no reason to either resume full-time work at BJ's or to find other full-time work.

Pl.Opp. at 6.

Price resigned from BJ's on December 9, 1986 in order to work full-time for R. Gargol Roofing ("Gargol").[3] He left this job on February 4, 1987, to work for Roger's Tank Wash at $6.00 per hour. Price stated in his affidavit that he believed he earned at most $750.00 while at Gargol. Price Affidavit at ¶ 12. Certified argues that this figure should be $960.00, because Price testified he worked forty hours per week for four weeks (February 5 to March 5).

1987 Price Deposition at 17–19. Price lost his job at Roger's Tank Wash when he failed a company physical.

Price's next employment began on April 10, 1987, at K & K, Inc. Price testified that he left K & K, Inc. after hearing of this court's order of May 4, 1987 that he be reinstated by Certified. 1987 Price Deposition at 22–23. Certified did not reinstate him, however, until June 7, 1987.

*Certified's Opposition*

Defendant Union has submitted a proposed judgment order requiring Certified to pay Price $26,960.93 as of November 1, 1987, and simple interest at 9% per year from that date until payment is actually made.

Certified contests this proposed order on four grounds. First, it argues that Price failed to mitigate his damages.[4] Certified therefore discounts the amount owed Price, excluding interest, to $19,933.00. Second, Certified argues that Price's net back pay should be reduced by a further $9,234.00, reflecting unemployment compensation which Price received between April 12, 1986 and June 7, 1987 ("the back pay period"). Third, Certified argues that Price's back pay award should not include those payments Certified would have made on Price's behalf to a pension and a health and welfare trust fund ("the trust funds") if he had been employed by it during the back pay period. Fourth, Certified argues that no interest is due and owing. (Alternatively, Certified argues that if the court awards interest, it should be calculated according to 28 U.S.C. § 1961(a), which would set the rate at 6.35 percent for 1986, and 6.69 percent for 1987.) Certified's bottom line figure, excluding all interest, is $10,099.00.

DISCUSSION

We address each of these four arguments in turn.

---

**3.** Certified argues that Price's "decision to resign from BJ's to work as a roofer in the dead of winter was unreasonable and not a valid alternative to remaining at BJ's full-time.

This proposition has been validated by the fact that the job lasted only eight weeks." Pl.Opp. at 7.

**4.** Defendant does not dispute that Price had a duty to mitigate his damages.

## Mitigation of Damages

Price had a duty to make reasonable attempts to mitigate his damages. "The principle of mitigation of damages ... requires that a person to whom a wrong has been done take reasonable steps to minimize the harm, on pain of having his award of damages cut down if he does not. The test in employment discrimination cases *as in other cases* is reasonable diligence." *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1427 (7th Cir.1986) (§ 1981 action) (emphasis added) (citation omitted). The dispute between the parties concerns what job-seeking effort constitutes reasonable diligence, and what Price actually did to seek other work.

■ The defendant in this case (representing the worker receiving the back pay award) has the original burden of ascertaining and showing a gross back pay amount owing to the unfairly discharged employee. *NLRB v. United Contractors, Inc.*, 713 F.2d 1322, 1330 (7th Cir.1983). The burden then shifts to the company to establish facts which mitigate its liability. *Id.; NLRB v. NHE/Freeway, Inc.*, 545 F.2d 592, 593 (7th Cir.1976). The company has an affirmative obligation to show that:

> (1) the plaintiff *failed to exercise reasonable diligence* to mitigate his damages, and
>
> (2) there was a reasonable likelihood that the plaintiff might have found *comparable work by exercising reasonable diligence.*

*Hanna v. American Motors Corp.*, 724 F.2d 1300, 1307 (7th Cir.) (emphasis in original), *cert. denied, sub nom. American Motors Corp. v. Hanna*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984); *Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 153 (7th Cir.1981).

■ In *Hanna*, the Seventh Circuit addressed the duty to mitigate back pay damages under the Vietnam Era Veterans' Readjustment Assistance Act, 38 U.S.C. § 2022. Presumably, the duty to mitigate is the same whatever the source of the obligation creating a back pay award. However, in a later case, *Hunter v. Allis–Chalmers Corp., Engine Div.*, the Seventh Circuit cited *Hanna, see* 797 F.2d at 1427, but found that an employer had carried its burden simply by showing a failure to make a reasonable effort to seek other work, without mentioning the second element in *Hanna*, that the company show that comparable work was available. The Seventh Circuit appeared to believe that the worker's conduct in *Allis–Chalmers* was egregious, as he had essentially failed to find a job for five years. The court ruled that this could only be due to a failure to search diligently. The plaintiff testified that he could only remember having applied to sixteen employers, *id.* at 1428, other than the four for whom he worked for short periods of time, *id.* at 1427. Based on those facts, the Seventh Circuit stated, "[g]iving every benefit of the doubt ... we nevertheless conclude that the maximum period of unsuccessful search that [the worker] can be allowed, consistently with the record and the case law, is three years." *Id.* at 1428. Assuming that *Allis–Chalmers* would not overrule *Hanna* without saying so, the cases can be reconciled only if one reads *Allis–Chalmers* as creating an egregious conduct exception to the general rule in *Hanna*. Price's back pay award therefore falls under the *Hanna* test, as his conduct has clearly not been egregious: Even if one ignores Price's testimony about his constant efforts to seek work during the fourteen months in question, and ignores Price's proffered list of some thirty employers whom he recalled (or had kept notes regarding) contacting, it remains undisputed that Price's longest spell without work was a few weeks at a time, and the longest spell without full-time work was the eight months he worked part-time at BJ's. This does not even approach the conduct in *Allis–Chalmers*.

Certified has made no showing that Price's job at BJ's constitutes comparable work. Nor has it shown that Price could have found comparable work by exercising reasonable diligence. Certified's case relies on Price's failure to return to BJ's

full-time.[5] Price earned $6,736.95 during the approximately fourteen months in the back pay period. Certified claims that he should have earned $11,363.00 by staying at BJ's full-time. However, the jobs cannot be considered comparable—BJ's paid $5.30 per hour, $11,024 per year, but Certified paid between $12.765 and $13.265 per hour, which is between $26,551.20 and $27,-591.20 per year.[6] It is hard to say exactly what "comparable" means. It is clear, however, that two jobs are not comparable when one pays from 2.4 to 2.5 times as much as the other.

We find, therefore, that Certified has not met its burden of proof that Price failed to mitigate his damages.

*Unemployment Compensation*

■ The Seventh Circuit imposes no requirement that unemployment insurance benefits be deducted from a back pay award. *Allis–Chalmers,* 797 F.2d at 1429. On the contrary, the Seventh Circuit has stated that the most logical result is for the state to recoup, but that if the state is unable or unwilling to do so then the wronged worker, not the employer, is the "logical choice" to receive the admittedly unmerited windfall. *Id.* Here, Price has an obligation to return the $9,234.00 that he received in unemployment benefits to the State of Illinois. Ill.Rev.Stat. ch. 48 ¶ 490(D). Therefore, this portion of Price's total award should be issued in the form of a two-party check, to Price and the Director of the Department of Employment Security of the State of Illinois. *See Id.*

*Payments to the Trust Funds*

■ Certified notes that our previous opinion refers only to its obligation to "reimburse Price for his lost wages." Sept.Op. at 8. Fringe benefits, Certified argues, are not wages and therefore beyond the scope of the damages to which Price is entitled. It is true that our previous opinion refers only to "lost wages."

However, the rationale of that decision, and its unmistakable import, was that Certified owed Price and the Union damages for breach of contract. *See* Sept.Op. at 1. Price should be compensated for lost work subsequent to Certified's unjustified decision not to reinstate him after the arbitration decision in his favor. And the Union is entitled to receive whatever contributions the employer would have made on Price's behalf. If fringe benefits, or payments to trust funds, are part of that loss, then Price and the Union are entitled to whatever damages will make them whole.

Certified cites *Syvock v. Milwaukee Boiler Mfg.,* 665 F.2d 149, 161 (7th Cir. 1981), to support its view that Price would be entitled to such payments only if he had proved that he had actually incurred expenses for substitute insurance coverage, or for medical expenses that would have been covered by the health and welfare plan during the back pay period. However, *Syvock* illustrates the weakness of Certified's case on this issue,

The [district] court correctly added to the total award contributions the employer would have made to the pension fund. The court refused, however, to include lost health insurance benefits in the award because Syvock had not purchased alternate coverage. The inclusion of the cost of health insurance benefits in the award is discretionary with the trial court, and we find no abuse of discretion in this area.

*Syvock,* 665 F.2d at 161 (citations omitted). There is a significant difference between payments which would go directly to the worker, and payments to trust funds on his behalf. A back pay award of health insurance premiums to a worker who had incurred no medical or medical insurance expenses would be a windfall, and therefore probably inappropriate. By contrast, payments on his behalf to a trust fund are not a windfall to him. Nor, in this case, are

5. Although the cases are not completely clear, in some circumstances part-time work can constitute sufficient mitigation of damages. *See Hunter,* 797 F.2d 1417 at 1428 (discussing *Orzel v. City of Wauwatosa Fire Dept.,* 697 F.2d 743,

756–57 (7th Cir.1983), *cert denied, sub nom. City of Wauwatosa Fire Dept. v. Orzel,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983)).

6. Assuming 52 weeks, at 40 hours per week.

they a windfall to the trust funds, because these are contract not tort damages.

*Appropriate Amount and Rate of Interest*

The object of the back pay award to Price is to make him whole. "Prejudgment interest is an element of complete compensation." *West Virginia v. United States,* 479 U.S. 305, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987) (contractual debt); *see also General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983). "[P]rejudgment interest is part of full compensation ... necessary to carry out the federal policies of compensation and deterrence." *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1297 (7th Cir.1987).

Certified argues that Price is not entitled to prejudgment interest because this court's role is limited to enforcing an arbitration award. Certified characterizes this court's award as one based upon the parties' collective bargaining agreement, which is silent on interest. Therefore, Certified argues, this court should model its award after that of an arbitrator in similar circumstances. Because arbitrators customarily do not grant interest as part of a back pay award this court should also refuse to do so.

■ The Union disagrees with Certified's characterization of arbitrators' practice, but even if Certified is correct, this court is not acting as an arbitrator. Rather, as our previous opinion made clear, we are enforcing an arbitrator's decision in the face of a party's breach of contract by its refusal to comply. Therefore, we are not limited by the terms of the collective bargaining agreement. Instead, we use a standard under which "[m]oney today is simply not a full substitute for the same sum that should have been paid some time ago." *Handy Button Mach. Co.,* 817 F.2d at 1297.

■ If the award is to compensate Price fully, the interest should be at the market rate. *See id.* District courts have discretion to select an appropriate interest rate in a case arising under federal law. The issue is not often presented, as most cases in which pre-judgment interest is appropriate arise under diversity, or under federal laws which look to the state rate of pre-judgment interest. Here, the parties disagree as to what rate of interest is appropriate. Certified argues for the rates set in 28 U.S.C. § 1961(a), the post-judgment interest statute. The union argues for the NLRB rate, which is higher.

■ The Labor–Management Relations Act (LMRA), under which this case arises, does not specify a method for computing pre-judgment interest. And, there is no general prejudgment counterpart to 28 U.S.C. § 1961. We turn therefore to admiralty law for guidance, because admiralty law is one of the few areas of purely federal law in which federal courts routinely award pre-judgment interest. *See United States v. Peavey Barge Line,* 748 F.2d 395, 401–402 (7th Cir.1984) (pre-judgment interest ordinarily awarded in admiralty). Federal courts are not bound by the state rate of pre-judgment interest in admiralty cases. *See, e.g., Central Rivers Towing v. City of Beardstown,* 750 F.2d 565, 574 (7th Cir. 1984). The rate is discretionary with the trial court. *Id.* Reliance on the statutory rate of interest in the state in which the court is sitting is now disfavored. *Id.*

■ The court is obviously not equipped to conduct surveys of the investment patterns of workers and unions in order to calculate whether the rate of return on savings accounts, money markets, Certificates of Deposit, municipal bonds, or pork belly futures best reflects the investment habits of the victors in cases arising under the LMRA. It seems simplest, and perhaps therefore wisest, to borrow a standard from the agency with the most expertise in the area, the NLRB. The NLRB commonly makes back pay awards in cases where employees have been improperly discharged. The NLRB uses the "short term federal rate," which is the rate assessed by the IRS on the underpayment of taxes. *See New Horizons for the Retarded,* 283 NLRB No. 181 (1987). The applicable pre-judgment interest rates for the back pay period (April 12, 1986 to June 7, 1987) are:

April 12, 1986—June 30, 1986    10%
July 1, 1986—June 7, 1987    9%

Union Support Mem. at Exhibit I (letter from NLRB office of the General Counsel).

In addition, we adopt the NLRB's method of calculating accrued interest on back pay awards. Back pay is earned from week to week. Calculating the interest on such sums could be complex. The NLRB method is designed to lessen this difficulty by assuming that all pay is earned on the last day of each quarter, and assessing interest accordingly. *See* Affidavit of Attorney Barry M. Bennett at ¶¶ 5–8.[7]

The Union also seeks interest on the back payments to the trust funds. The discussion above applies with equal force to the trust funds. However, the Funds' agreement with Certified provides for a straight payment of ten percent on all late contributions. *See* Union Support Mem. at Exhibit J. Therefore, rather than use the NLRB rate, the contractual rate of interest should apply to the sums due to the Funds.

CONCLUSION

The Union is directed to submit a judgment order consistent with this opinion by March 31, 1988, together with whatever supporting materials will make it possible for the court to check its calculations.[8] The order should provide for three separate checks—one to Price, one jointly to Price and the Director of the Department of Employment Security for the State of Illinois, and one to the Funds.

---

7. Mr. Bennett's affidavit, which explains in detail the complicated arithmetic used by the NLRB to calculate a back pay award, is a rare example of attorney testimony falling under DR 5–101(b)(1), which permits testimony by a lawyer as to an uncontested matter.

8. The judgment order now before the court is premised on a faulty calculation. Price would have received pay from Certified of $31,306.00. His interim earnings total $6,736.95. Accordingly, he is entitled to $24,569.05 of back pay plus interest, not $24,559.05. *Cf.* Union Support Mem. at 12.