## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

v.

## CORINTH, INC. d/b/a Top Notch Restaurant.

### Civ. No. H91–227.

United States District Court, N.D. Indiana, Hammond Division.

June 28, 1993.

Alice M. Craft, Michael Hunter Freese, Jo Ann Farnsworth, EEOC, Indianapolis, IN, Donald R. Livingston, EEOC, Washington, DC, for plaintiff.

Samuel L. Cappas, Lesniak and Ruff, East Chicago, IN, for defendant.

## ORDER

LOZANO, District Judge.

This matter is before the Court pursuant to Fed.R.Civ.P. 52(a), for a decision on the merits following the bench trial conducted in this case. For the reasons stated herein, the Court finds that the Plaintiff, Equal Employment Opportunity Commission ("the EEOC"), is entitled to judgment in this action, and that relief will be awarded consistent with this order.

BACKGROUND

This is an action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), wherein the EEOC is the Plaintiff and Corinth, Inc. d/b/a Top Notch Restaurant ("Corinth") is the Defendant. The EEOC brought this action on behalf of Amy Alexander, the complaining witness, alleging that she was discriminated against on the basis of sex in violation of Title VII, 42 U.S.C. § 2000e–2(a). A bench trial was conducted on this matter, and at the conclusion of the EEOC's case Corinth made its motion requesting involuntary dismissal, which this Court denied on March 25, 1993. Corinth's case was then heard. Having examined the entire record and having determined the credibility of the witnesses after viewing their testimony and demeanor, pursuant to Federal Rule of Civil Procedure 52(a), the Court now enters its findings of fact and conclusions of law.

FINDINGS OF FACT

The EEOC is an agency of the United States of America, charged with the administration, interpretation, and enforcement of Title VII, and is expressly authorized to bring this action by § 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1). Corinth has continuously been and is now an employer engaged in an industry affecting commerce within the meaning of §§ 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and

(h), and has continuously been and is now doing business in the State of Indiana, and has continuously had and now has at least 15 employees.

Corinth is owned by Chris Boultas and George Katemis, and operates Top Notch Restaurant in Highland, Indiana. Both owners manage Top Notch Restaurant and supervise the employees. Mr. Boultas regularly works during the noon until midnight shift, and Mr. Katemis usually works from midnight until noon.

Amy Alexander was employed as a waitress at Top Notch Restaurant in October of 1989. Ms. Alexander worked full-time at Top Notch, at the rate of $2.01 per hour, plus tips. Ms. Alexander worked various schedules, but most often worked afternoons from 11 a.m. to 8 p.m., or 12 p.m. to 8 p.m., under the supervision of Mr. Boultas. However, she was occasionally supervised by Mr. Katemis when she worked morning shifts.

On November 3, 1990, Ms. Alexander was discharged by Corinth. At the time she was six months pregnant. During the EEOC's case-in-chief, Amy Alexander, testified that on November 3, 1990, she was not scheduled to work, which was strange for a Saturday. After unsuccessfully trying to reach Mr. Boultas by phone, she went to Top Notch at approximately 1 p.m. She confronted her supervisor, Chris Boultas, a co-owner of Top Notch Restaurant, who told her she was not scheduled for further work because she was pregnant. He also told her that it would be dangerous for her to continue working because she was "too big" and "might fall down." Betty Guzman, a friend of Ms. Alexander, also testified during the EEOC's case, stating that she accompanied Ms. Alexander to Top Notch on November 3, 1990, and was present when Mr. Boultas told Amy Alexander that she had not been scheduled for work because she was pregnant. No evidence was offered to rebut this testimony or to contradict this Court's finding that Mr. Boultas made these statements.

Plaintiff's Exhibit 5, the affidavit of EEOC investigator Shirley A. Swaniger, who investigated Amy Alexander's discrimination charge against Corinth, was admitted as evidence. As part of her investigation Ms. Swaniger interviewed the owners of Corinth on January 17, 1991. During Ms. Swaniger's investigative interview Mr. Boultas and Mr. Katemis admitted that they both agreed to discharge Amy Alexander because she was pregnant. Mr. Katemis stated that, "she was pregnant ... [and] needed to stay home." Mr. Boultas stated that, "[Amy] was too big to work."

Joint Exhibit 1, Amy Alexander's discrimination charge, and Joint Exhibit 2, a letter from Mr. Katemis to the EEOC, were also admitted as evidence. In paragraph two of Joint Exhibit 1, Amy Alexander stated. that,

On November 3, 1990, I contacted the restaurant and learned that I was not on the schedule. On the same date, I went and spoke with Chris (Boultas). Because I am six months pregnant, he stated that it would be dangerous for me to work because I could fall down. On November 4, 1990, George (Katemis) told me I could come back after the baby.

In Joint Exhibit 2, Mr. Katemis acknowledged receiving Ms. Alexander's charge and admitted that he agreed with her statement in paragraph two of Joint Exhibit 1. Mr. Katemis' letter, Joint Exhibit 2, is an additional admission that Ms. Alexander was discharged due to her pregnancy.

Anticipating the contentions of the defense, the EEOC offered evidence that Amy Alexander was competently performing her job when she was discharged. In addition to Ms. Alexander's own testimony to that effect, the EEOC presented the testimony of Cindy Radencich, also a waitress at Top Notch. She testified that Amy Alexander's job performance suffered no noticeable decline in September and October of 1990, prior to her discharge. She noted, contrary to Defendants' contentions that only Amy Alexander needed help from other waitresses and busboys, that all the waitresses received help from the other employees when serving large parties, and Ms. Alexander was no different. This testimony was corroborated by the testimony of Carl Cashman, a busboy at Top Notch Restaurant, who also worked with Ms. Alexander. He stated that he helped all the waitresses with their trays so as to earn

better tips. Mr. Cashman stated that while he helped many of the waitresses carry their trays, he does not specifically remember carrying any of Ms. Alexander's trays, and that in his estimation, her job performance did not suffer due to her pregnancy.

Finally, Karen Williams, also a waitress at Top Notch Restaurant who worked overlapping shifts with Ms. Alexander, stated that she did not notice a change in Ms. Alexander's job performance during her pregnancy. She also stated that she and other waitresses often asked the busboys to carry their larger trays, and that this was a common practice at the restaurant.

In order to justify the dismissal of Ms. Alexander, Corinth offered evidence seeking to contradict the EEOC's contention that Amy Alexander was fully able to perform her job at the time she was discharged. First, Kathleen Pierce, a waitress at Top Notch during the tenure of Ms. Alexander, testified that she witnessed Ms. Alexander slowing down during September and October of 1990. Ms. Pierce stated that she helped Ms. Alexander with her trays, but also admitted that all of the wait staff helped each other with their large orders. However, on direct examination, Ms. Pierce stated that she was not present when Ms. Alexander did her side work (coffee and water service, cleaning, and preparation), and that she didn't know whether Amy Alexander took more breaks than were allotted.

Sandra Scheringa Hoenig, also a waitress at Top Notch during Ms. Alexander's employment, testified on behalf of Corinth. Ms. Hoenig stated that her work schedule overlapped with Ms. Alexander's approximately 9 to 13 hours per week, and that in September and October of 1990, she noticed Ms. Alexander slowing down and not properly caring for her station. She also stated that she noticed other waitresses and busboys carrying trays for Amy Alexander. On cross-examination, the EEOC attempted to impeach Ms. Hoenig with her own affidavit, wherein she stated to EEOC investigator Shirley Swaniger, shortly after Ms. Alexander's filing her charge with the EEOC, that Amy performed her job satisfactorily, always did her work, and would often work an extra shift if someone called in sick. However, at trial she disavowed the affidavit, stating that she had signed her name to the piece of paper, but had not read it. This Court finds her story to be suspect, and specifically finds that the testimony of Ms. Hoenig is not credible.

The Court also finds the testimony of both Corinth owners, George Katemis and Chris Boultas, to suffer from problems of credibility, as both were impeached at trial. On the stand, Mr. Katemis stated that before Ms. Alexander became pregnant she was a good waitress, but after she became pregnant he noticed a change in her work habits. He stated that her job performance was down, that she couldn't carry or serve food properly, and that she often asked to go home or asked other waitresses for help. He stated that he never told her that she was fired, but that he did tell her that this was her last week on the schedule and that she would be let off until after the baby was born. Furthermore, on direct examination, Mr. Katemis stated that he received complaints from other waitresses and customers about Ms. Alexander's job performance. However, on cross-examination Mr. Katemis' was impeached by his deposition, wherein he stated that he had not received customer complaints regarding Ms. Alexander, and could not recall any specific complaints by any of her co-employees.

Additionally, Mr. Katemis' testimony must be reconciled with statements he made to EEOC investigator Shirley Swaniger, that "[Ms. Alexander] was pregnant ... [and] needed to stay home," and with his statements made in Joint Exhibit 2, the letter he sent to the EEOC on December 11, 1990. In the letter, Mr. Katemis complains of Ms. Alexander's job performance. However, he states that he would be willing to rehire Ms. Alexander if his demands were met, which include 1) a physician work permit stating that her condition would enable her to carry heavy trays; 2) her agreement that she would be willing to stay out of the kitchen where it is dangerous and slippery; and 3) Ms. Alexander signing a release of any and all liability against the restaurant which may cause her harm [sic] because of her condition.

In this Court's view, these demands, made well before Mr. Katemis testified in this case, illuminate his true concerns, that Ms. Alexander would be in danger because of her pregnancy, or that the restaurant would suffer liability if she were injured while pregnant. Accordingly, his testimony at trial must be viewed in light of these prior statements, and his *post facto* justification for Ms. Alexander's discharge can therefore be given little effect.

This Court finds the testimony of Mr. Boultas to similarly lack credibility. On direct examination, Mr. Boultas testified that Ms. Alexander was unable to do her side work, and that he had to help her carry her trays. Additionally, he said that others also carried trays for Ms. Alexander. However, on cross-examination Mr. Boultas was impeached by his own deposition, wherein he voiced a different justification for Ms. Alexander's termination. On page 24 of his deposition, when asked whether it was his idea to fire Ms. Alexander, he responded that "she cannot carry the tray," but also, that "I think she can have a miscarriage here. Something could happen bad to her." On page 25, he stated that "She could not do the job; it was dangerous for her there and with the bleeding, with the trays, and I think it was better for us and for her to leave." Further, on page 25 of his deposition, Mr. Boultas was asked why he thought it would be dangerous for her to continue her employment. He responded, "for her health and the baby's health, sir ... [she will] have the miscarriage."

Although Mr. Boultas stated in his direct examination that he was motivated solely by the fact that Ms. Alexander was unable to do the work, in light of the impeachment testimony, and Mr. Boultas' statements made during the EEOC investigation of this case which were placed in evidence, this Court cannot find Mr. Boultas' testimony to be credible.

## CONCLUSIONS OF LAW

Section 708(a) of Title VII, 42 U.S.C. § 2000e-2(a), prohibits discrimination in employment on the basis of sex. The Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), amends Title VII's definitional section by mandating that pregnant employees be treated the same for all employment related purposes as other persons not so affected, but similar in their ability or inability to work. 42 U.S.C. § 2000e(k). The Seventh Circuit has construed the PDA to prohibit employers from forcing pregnant employees who remain able to work to stop working and take leave unless the employer can show the leave is necessary because the condition of pregnancy is incompatible with continued employment. *Maganuco v. Layden Community High School District 212*, 939 F.2d 440, 445 (7th Cir.1991). *Cf. Carney v. Martin Luther Home, Inc.*, 824 F.2d 643 (8th Cir.1987).

As Plaintiff in a Title VII action, the EEOC bears the initial burden of establishing a *prima facie* case of discrimination. A plaintiff may meet its burden of establishing a *prima facie* case of discrimination through direct evidence. *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir.1991). In a direct evidence case, a plaintiff initially must prove "through direct evidence that the employment decision at issue was based upon an impermissible factor." *Id.* (quoting *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 568 (7th Cir. 1989)). Once a *prima facie* case has been made through direct evidence, "the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account." *Randle*, 876 F.2d at 569. In other words, under the PDA, a pregnant employee's ability or inability to work is the only factor the employer may consider. Terminating a pregnant employee, or forcing her to take leave, because of concern for her health or concern for the employer's potential liability, are employment decisions based upon impermissible factors. In order to justify terminating or forcing a pregnant employee to take mandatory leave, the employer must show "that the leave is necessary because the condition of pregnancy is incompatible with continued employment." *Maganuco*, 939 F.2d at 445.

EEOC Regulation, 29 C.F.R. § 1604.10(a) states that any "[E]mployment policy or

practice which excludes from employment applicants or employees because of pregnancy, childbirth, or related medical conditions is in *prima facie* violation of Title VII." Contrary to Corinth's suggestion, nothing in any of the subsections of 29 C.F.R. § 1604.10 suggests that an employer may terminate an employee because she is pregnant or force a pregnant employee who is able to perform her job to take leave without pay.

■ The EEOC has presented *prima facie* evidence of pregnancy discrimination in violation of Title VII. The EEOC presented evidence that Amy Alexander was told by Mr. Boultas, a co-owner of Top Notch Restaurant, that she was not scheduled for further work because she was pregnant, was "too big" and "might fall down". During the EEOC's investigation of this matter, both co-owners admitted that they agreed to discharge Ms. Alexander because she was pregnant. *See* Plaintiff's Exhibit 5. These admissions, admissible under Fed.R.Evid. 801(d)(2), constitute direct evidence of pregnancy discrimination because they relate directly to the employment decision at issue. *Randle,* 876 F.2d at 569–70; *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 791 (3rd Cir. 1985) (construing Age Discrimination in Employment Act, 29 U.S.C. 621 *et seq.*) ("direct evidence would include statements by employer to employee that s/he was being fired because of age"); *Lee v. County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir.1982) (direct testimony that defendants acted with discriminatory intent requires no inference).

Clearly, the EEOC has made out a *prima facie* case by direct evidence. No inference need be drawn that Ms. Alexander's pregnancy motivated her employer's decision to terminate her employment. Rather, the employer's own admissions establish this fact. As such, the EEOC has established a *prima facie* case through direct evidence.

■ The EEOC having established a *prima facie* case, the burden fell squarely on Corinth to prove that it discharged Ms. Alexander because she was unable to perform the duties of her job. It is the conclusion of this Court that Corinth has not made this showing. While there was some evidence that Ms. Alexander was having trouble carrying her trays, it was also established that waitresses often received help from each other and from other Top Notch personnel. This Court does not believe that the decision to discharge Ms. Alexander was motivated by her performance. Rather, it is this Court's conclusion that the decision was motivated by her condition. While the Corinth owners maintained at trial that the decision was based solely upon Ms. Alexander's ability to perform her job, the credibility of that position was seriously undermined by their own prior statements wherein they voiced concern for their own liability as well as for the health of this pregnant employee. As it is the conclusion of this Court that Corinth is unable to show that its decision to terminate Ms. Alexander was based upon her inability to perform her job, the concerns for her health, however well-intentioned, still constitute discrimination based upon sex. Title VII does not permit an employer's paternalistic notions of how a pregnant employee should conduct her affairs to be substituted for the woman's own judgment. Unless the employee is unable to perform her job, her pregnancy is simply not the business of the employer.

## RELIEF

Having determined liability in favor of the EEOC, this Court now must fashion appropriate relief. The EEOC seeks an order compelling Corinth to make whole Amy Alexander by providing appropriate backpay with prejudgment interest, as well as a permanent injunction enjoining Corinth, its officers, successors, assigns, and all persons who act in concert or participation with it, from engaging in any employment practice which discriminates on the basis of sex, and compelling Corinth to institute and carry out policies, practices, and programs which provide equal employment opportunities for women, and which eradicate the effects of its past and present unlawful employment practices.

■ Once a plaintiff has established that her employment was terminated as a result of unlawful discrimination on the part of her employer, a presumption in favor of full relief arises. *Albemarle Paper Co. v. Moody,* 422

U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); *see also Gaddy v. Abex Corp.,* 884 F.2d 312, 318 (7th Cir.1989). The remedial provisions of Title VII grant the Court broad discretion in ordering appropriate relief once a violation of Title VII is proved. Section 706(g) of Title VII provides in relevant part:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

42 U.S.C § 2000e–5(g).

■ In fashioning an appropriate remedy, a district court must ensure that the objectives of Title VII are achieved. *Albemarle Paper Co.,* 422 U.S. at 417, 95 S.Ct. at 2371. Accordingly, an appropriate remedy is one which is fashioned to achieve equality of employment opportunities and remove barriers that have operated in the past against protected groups, and to make persons whole for injuries suffered on account of unlawful employment discrimination. *Id.* at 417–418, 95 S.Ct. at 2371–2372 (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

*Back Pay*

■ "The [Supreme] Court has held that a finding that an employer engaged in employment discrimination in violation of Title VII triggers a rebuttable presumption that the claimant is entitled to an award of back pay...." *United States v. City of Chicago,* 853 F.2d 572, 575 (7th Cir.1988) (citing *International Bd. of Teamsters v. United States,* 431 U.S. 324, 359 & n. 45, 97 S.Ct. 1843, 1867, n. 45, 52 L.Ed.2d 396 (1977)); *see EEOC v. Gurnee Inn Corp.,* 914 F.2d 815, 817 (7th Cir.1990). Back pay is to run from the date of the Plaintiff's termination until the date of final judgment. *Daniels v. Essex Group, Inc.,* 740 F.Supp. 553, 561 (N.D.Ind. 1990). The EEOC bears the initial burden of establishing the amount of damages it seeks on Ms. Alexander's behalf. *Fleming v. County of Kane, State of Illinois,* 898 F.2d 553, 560 (7th Cir.1990). Ms. Alexander's back pay award should equal "the difference between actual earnings for the period and those which she would have earned absent the discrimination by the defendant." *Taylor v. Philips Industries, Inc.,* 593 F.2d 783, 786 (7th Cir.1979); *Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 502 F.2d 1309, 1321 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Therefore, "interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g).

■ Once a plaintiff establishes the amount of her damages she claims resulted from the employer's discriminatory conduct, the burden shifts to the employer to show that the plaintiff failed to mitigate her damages or that the damages were in fact less than she asserts. *Gaddy v. Abex Corp.,* 884 F.2d 312, 318 (7th Cir.1989). To establish that Ms. Alexander failed to mitigate her damages Corinth must show that:

> (1) Ms. Alexander failed to exercise reasonable diligence to mitigate her damages; and
>
> (2) There was a reasonable likelihood that Ms. Alexander might have found comparable work by exercising reasonable diligence.

*Id.; Syvock v. Milwaukee Boiler Mfg. Co.,* 665 F.2d 149, 159 (7th Cir.1981).

■ Plaintiff's Exhibit 1, the EEOC's damage calculations for Amy Alexander,

shows that Ms. Alexander worked a total of 44 weeks in 1990. Her total earnings for 1990 were $5,415.51, as evinced by her W-2 form for 1990, admitted as Joint Exhibit 4. This averages out to be $123.07 per week.

The EEOC offered evidence that the backpay calculation should run from November 3, 1990, when Ms. Alexander was discharged, until January 31, 1991, when Ms. Alexander would have stopped working in order to have her baby, and from February 21, 1991, when Ms. Alexander could have returned to work, until April 6, 1991, when Ms. Alexander returned to school, and consequently gave up her search for other employment. By this calculation, there is a total of 18 weeks backpay due Ms. Alexander, which is equal to $2,215.26.

Although Corinth argued in closing that Ms. Alexander failed to mitigate her damages, there was no specific evidence produced to this effect. As failure to mitigate damages is an affirmative defense, the burden fell upon Corinth to show that Ms. Alexander failed to exercise reasonable diligence to mitigate her damages, and that there was a reasonable likelihood that she may have found comparable work by exercising reasonable diligence. Corinth has not made this showing, and therefore the Court accepts the EEOC's damage calculation of $2,215.26 as backpay due Ms. Alexander.

However, before awarding backpay, this Court must determine whether unemployment insurance benefits received by Ms. Alexander constitute interim earnings which must be deducted from the backpay award. "The Seventh Circuit imposes no requirement that unemployment insurance benefits be deducted from a backpay award." *Certified Midwest, Inc. v. Local Union No. 738,* 686 F.Supp. 189, 193 (N.D.Ill.1988) (citing *Hunter v. Allis–Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1429 (7th Cir.1986). In *Allis–Chalmers,* the Seventh Circuit held that it was not an abuse of discretion for the district court judge to refuse to deduct unemployment benefits from an award of backpay. The Court reasoned that the most logical result is for the State to recoup from the recipient the unemployment compensation which has already been received and which

serves to compensate the same injury as an award of backpay. While the employee is not entitled to a double recovery by receiving this money as an award of backpay as well as through unemployment insurance, it is also incorrect to deduct the amount received through unemployment insurance from the backpay award the discriminating employer must pay, as the amount received by the employee was not paid directly by the employer, but rather, the payments were made "by the state out of state funds derived from taxation." *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 364, 71 S.Ct. 337, 340, 95 L.Ed. 337 (1951) (it is within the discretion of the National Labor Relations Board to refuse to deduct unemployment insurance payments from an award of backpay under National Labor Relations Act, from which Title VII remedy provision is derived). *See also EEOC v. O'Grady,* 857 F.2d 383, 389 (7th Cir.1988).

Because "unemployment is a vast and complicated system whose funds are not directly attributable to the employer," *Id.,* it is the holding of this Court that the $1,336 received in unemployment benefits by Amy Alexander will not be deducted from her award of backpay. Rather, it is Ms. Alexander's obligation to return the $1,336 that she received in unemployment benefits to the State of Indiana. Ind.Code Ann. § 22–4–5–1; Ind. Code Ann. § 22–4–13–1(e); *see also Green Ridge Mining, Inc. v. Indiana Unemployment Ins. Bd.,* 541 N.E.2d 550, 552 (Ind.Ct. App.1989); *Frost v. Review Bd. of Ind. Employment Sec. Div.,* 432 N.E.2d 459, 461 (Ind. Ct.App.1982). Additionally, once the Indiana Department of Employment and Training Services recoups the $1,336 from Ms. Alexander, Corinth will be entitled to a credit of the amount debited from its unemployment insurance trust fund. However, since this aspect of Indiana law was not briefed by the parties, this Court will not meddle in the administrative procedures of the State of Indiana.

*Prejudgment Interest*

In cases involving violations of the federal civil rights laws, prejudgment interest is available as a matter of course on an award of back pay, so long as this amount

is "readily determinable." *Daniels v. Pipefitters Ass'n Local No. 597*, 945 F.2d 906, 924 (7th Cir.1991) (quoting *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1298 (7th Cir.1987)). However, the amount of backpay need not be determined down to the last penny, as it is virtually impossible to determine the amount of backpay with absolute certainty. *Daniels*, 945 F.2d at 925. All that is necessary is that the calculation of back pay is reasonably certain and accurate.

▇ In the present case Ms. Alexander's backpay amount is readily determinable. As discussed, the award of $2,215.26 is based upon Ms. Alexander's average weekly earnings in 1990 of $123.07 per week. However, as she was awarded $1,336 in unemployment insurance, the Court believes that she was not deprived the use of this amount, and consequently, is not entitled to prejudgment interest on the $1,336. However, Ms. Alexander is entitled to prejudgment interest on the remaining $879.26. As the Seventh Circuit has approved awarding prejudgment interest based upon the Internal Revenue Service fluctuating rate, as the EEOC requests, prejudgment interest on the backpay award of $879.26 will accordingly be allowed, computed on the basis suggested; but the EEOC will be required to file, within 15 days of the date of this order, a current computation of this award.

*Injunctive Relief*

▇ Section 706(g) of Title VII grants the Court power to fashion injunctive and affirmative relief as may be appropriate to vindicate the policies of Title VII as well as to afford private relief to the individual employee discriminated against. *Sprogis v. United Airlines, Inc.*, 444 F.2d 1194, 1201–1202 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (7th Cir.1971). Indeed, the Seventh Circuit has held that the Court's equitable power "should be broadly read and applied so as to effectively terminate the practice and make its victims whole," and that this "relief should be made available to all who are so damaged, whether or not they file charges and whether or not they joined in the suit." *Id.* at 1202.

▇ As the Court discussed above, it was shown through the admissions of the co-owners of Corinth that Ms. Alexander was discharged due to the fact that she was six months pregnant and her employers believed that it would be too dangerous for her to remain in their employ during the remainder of her pregnancy. Additionally, Corinth had no anti-discrimination policy regarding female employees, and there was evidence that in the past other pregnant employees had been removed from the schedule and told they could return to work after they had their babies. Accordingly, the Court concludes that Corinth "intentionally engaged" in an unlawful employment practice against Ms. Alexander, and that these actions were "deliberate rather than accidental." *Williams v. General Foods Corp.*, 492 F.2d 399, 406 (7th Cir.1974); *see also Sprogis*, 444 F.2d at 1202. That fact that the EEOC has not alleged a pattern of discriminatory activity does not prevent this Court from issuing an injunction against further discrimination. *EEOC v. FLC & Bros. Rebel, Inc.*, 663 F.Supp. 864, 870 (W.D.Va.1987), *aff'd*, 846 F.2d 70 (4th Cir.1988).

▇ As Corinth does not have a policy against discrimination on the basis of pregnancy, and the Corinth owners admitted to the EEOC in the investigation of this matter that they discharged Ms. Alexander because she was pregnant, it is obvious to this Court that these individuals are not well informed on the law prohibiting discrimination against persons because of their sex. Additionally, Corinth does not have an anti-discrimination policy, but employs many women as waitresses in its restaurant. Accordingly, the Court will grant the EEOC's request for an injunction, enjoining Corinth from further engaging in practices which discriminate against persons because of their sex and the condition of pregnancy. Corinth will be required to post notices advising its employees that Title VII prohibits employers from forcing pregnant women who remain able to work to stop working and take leave unless the leave is necessary because the condition of pregnancy is incompatible with continued employment. This notice must also inform employees of the correct procedure to report to the EEOC any alleged violations of Title VII.

However, contrary to the request of the EEOC, the Court will not require that George Katemis and Chris Boultas attend training seminars or classes to better educate themselves on discrimination in the work place. While it is the legal obligation of the Corinth owners to acquaint themselves with the law, and follow its mandates, this Court will not require that they are forced to attend class. The obligation to know and follow the law is solely their own, and they will be held accountable for failing to act as the law requires.

*Costs*

 The EEOC asks that as prevailing party in this action it is awarded its costs. Federal Rule of Civil Procedure 54(d) provides that "except when express provision therefor is made either in a statute of the United States or in these Rules, costs shall be allowed as of course to the prevailing party, unless the court otherwise directs...." Additionally, 28 U.S.C. § 2412(a) provides, "[A] judgment for costs, ... but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action."

The plain language of Rule 54(d), as well as the law of the Seventh Circuit, provide that costs will be allowed "as a matter of course to the prevailing party." "[D]enial of costs to the prevailing party or the assessment of partial costs against him is in the nature of a penalty for some defection on his part in the course of the litigation as, for example, by calling unnecessary witnesses, bringing in unnecessary issues or otherwise encumbering the record...." *Chicago Sugar Co. v. Am. Sugar Refining Co.*, 176 F.2d 1, 11 (7th Cir.1949).

The EEOC has submitted a statement of its costs as Plaintiff's Exhibit No. 8. Although Corinth has argued that it believes the costs to be excessive, this Court cannot agree, as the Court finds the costs submitted by the EEOC to be well-taken and reasonable. Accordingly, the Court awards the EEOC its costs in bringing this action, including the costs of depositions, the trial transcript, and witness attendance fees, totalling $1,510.50.

CONCLUSION

For the reasons stated above, it is hereby **ORDERED** as follows:

1. Judgment shall be, and hereby is, entered in favor of the EEOC and against Corinth.

2. Corinth shall pay to Amy Alexander, the charging party, backpay in the amount of $2,215.26. However, Amy Alexander must notify both EEOC and Corinth's attorney, Mr. Cappas, when she has paid, and the Indiana Department of Employment and Training Service has recouped, the $1,336 she received as unemployment insurance benefits.

3. Within 15 days after the entry of this order, the EEOC will compute and submit the prejudgment interest accrued on $879.26 of the backpay award. Corinth will have 10 days to file a response, if any, and the EEOC will have 7 days to file a reply, if any.

4. The EEOC will be awarded its costs in the amount of $1,510.50.

5. Corinth shall be, and hereby is, enjoined from further engaging in any practice which discriminates against women due to their sex, and due to the condition of pregnancy. Appropriate notice shall be posted notifying all employees of their rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, to be free from discrimination on the basis of sex. The notice will further state that Title VII prohibits employers from forcing pregnant employees who remain able to work to stop working and take leave unless the leave is necessary because the condition of pregnancy is incompatible with continued employment. This notice will also inform employees of the correct procedure to report any alleged violations to the EEOC. Corinth is **ORDERED** to consult with the EEOC in fashioning this notice to ensure that it is correct and meets the EEOC's reasonable approval.